Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Sandra Smith Thayer (SBN 200294)
SThayer@PasichLLP.com
Caitlin S. Oswald (SBN 330974)
COswald@PasichLLP.com
PASICH LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7860
Facsimile:  (424) 313-7890

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AECOM, a Delaware corporation, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT FOR BREACH OF CONTRACT, ANTICIPATORY BREACH OF CONTRACT, TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND DECLARATORY RELIEF** |
| ZURICH AMERICAN INSURANCE COMPANY, a New York corporation, | |
| Defendant. | |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff AECOM hereby complains of defendant Zurich American Insurance Company and alleges as follows:

### NATURE OF THIS LAWSUIT

1.    AECOM is the world's premier infrastructure consulting firm.  It provides planning, design, engineering, consulting, and construction management

services around the world.  Given its global operation, it purchased broad, "all risk" EDGE Global property insurance policies from Zurich.  Among other things, the policies promised coverage for AECOM's economic losses from all risks not expressly excluded.  Even though the insurance industry has had a standard-form "virus and bacteria" exclusion since 2006 and various forms of pandemic exclusions, Zurich sold its policies without including either form of exclusions.

2.    After the outbreak of SARS-CoV-2 and COVID-19, AECOM is informed and believes, and on that basis alleges, that SARS-CoV-2 was present on its properties and the properties of others, thereby physically altering air, airspace, and surfaces preventing AECOM from using its properties for their intended purpose and function.  As a consequence, it suffered loss and damage covered by the policies.  Therefore, AECOM turned to Zurich for the coverage Zurich promised.  However, even though it had decided by March 2020 not to pay for losses associated with the pandemic, Zurich delayed for months in telling AECOM its coverage position.  In fact, even though Zurich represented on August 23, 2020, that it would provide its "official coverage determination communication," Zurich did not provide its final coverage position until October 13, 2020, more than six months after AECOM first notified Zurich of the claim.  Instead of agreeing to pay AECOM for any part of its millions of dollars of insured loss, Zurich denied coverage.

3.    AECOM is informed and believes, and on that basis alleges, that Zurich has taken, and is taking, a similar position with other insureds, having adopted a corporate-wide position that deprives AECOM and its other insureds of hundreds of millions of dollars of promised insurance.  AECOM is informed and believes, and on that basis alleges, that Zurich has done so, and is doing so, to protect its financial interests at the expense of its insureds' interests and with conscious disregard and disdain for the rights, interests, and reasonable expectations of its insureds, including AECOM.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

4.      Zurich's conduct constitutes a breach of the insurance policies and violates the implied covenant of good faith and fair dealing.  By this lawsuit, AECOM seeks recovery for the damages Zurich has inflicted upon it by its wrongful conduct.  AECOM also seeks declaratory relief confirming that Zurich must honor the terms of its policies.

### JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction to hear this case under 28 U.S.C § 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of the costs and interest, exceeds $75,000.

6.      The Court has personal jurisdiction over Zurich because Zurich is licensed to transact, and transacts, business in the State of California and this District.

7.      Venue is proper in this District because a substantial part of the events giving rise to AECOM's claims occurred in this District, including negotiations regarding the policies and the issuance of the policies through an insurance broker located at 725 S. Figueroa Street, Los Angeles.

### THE PARTIES

8.      AECOM is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Los Angeles, California. AECOM is authorized to pursue this action, and to collect, on behalf of all of its affiliates and subsidiaries that are insured under the policies at issue herein.

9.      AECOM is ranked No. 1 in *Engineering News-Record*'s 2020 "Top 200 Environmental Firms, is ranked No. 1 in *Engineering News-Record*'s 2020 "Top 500 Design Firms, and has been named by *Fortune* magazine as one of the "World's Most Admired Companies" for six consecutive years. Among its projects around the world, AECOM (and its various companies) is part of the joint venture that led the development and construction of SoFi Stadium, one of the world's

**COMPLAINT AND DEMAND FOR JURY TRIAL**

largest stadium complexes, and is designing all elements of Victoria's largest-ever public transport project, leading the design of the Inglewood Basketball & Entertainment Center (the future home of the Los Angeles Clippers), and led repair efforts for the Virgin Islands Housing Finance Authority Emergency Home Repairs Program after Hurricanes Irma and Maria.

10.    Zurich is a corporation organized and existing under the laws of the State of New York with its headquarters in Schaumburg, Illinois. Zurich is a part of the Zurich Insurance Group of Companies. AECOM is informed and believes, and on that basis alleges that Zurich is owned by Zurich Holding Company of America and that its ultimate parent is Zurich Insurance Group Ltd.

11.    Zurich and the other members of the Zurich Insurance Group Ltd. brand hold themselves out to the public as the Zurich Insurance Group. They maintain a worldwide website at https://www.zurich.com. The Zurich Insurance Group makes various statements and representations on its website on behalf of its member companies, including Zurich.

12.    According to the Zurich Insurance Group website, the Zurich Insurance Group "is a leading multi-line insurer that serves its customers in global and local markets. With about 55,000 employees, it provides a wide range of property and casualty, and life insurance products and services in more than 215 countries and territories."[1]

13.    On its website, the Zurich Insurance Group proclaims:

> Our heritage is about helping customers understand and
> protect themselves from risk. Since 1872 we have been
> applying our expertise and experience so that our
> customers can have the very best protection for the
> things they value. This is our mission and the timeless

---

[1] https://www.zurich.com/en/about-us/a-global-insurer.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1    idea behind our brand. It is also the authentic truth that

2    has been and always will be at the heart of the Zurich

3    brand.[2]

4    14.    Since the outbreak of the COVID-19 pandemic, the Zurich Insurance

5    Group has made wide-ranging representations.  The following are some of the

6    many representations and promises that the Zurich Insurance Group has made, and

7    still makes as of the date of the filing of this lawsuit:

8    •    "As a society, we are facing unprecedented challenges that are

9         immediate and will have long-lasting implications. At Zurich,

10        responding to these challenges goes to the heart of our purpose as a

11        business, and our promise to customers."[3]

12   •    "The spread of Coronavirus (Covid-19) is unprecedented and we

13        understand this is an incredibly difficult time for families and

14        businesses. We are here to help customers and businesses who are

15        affected by the impact of Covid-19 in these challenging times."[4]

16   •    "Customers buy insurance for times like these. They want to know

17        that there is a strong financial institution backing them up when they

18        are in need."[5]

19   •    "Our customers need us now more than ever.  It's a challenging time

20        for everyone, everywhere, both personally and professionally. How

21        we in the insurance sector react in a crisis can make all the difference

22

23

24   _____

[2] https://www.zurich.com/en/about-us/a-global-insurer/our-brand.

25   [3] https://www.zurich.com/services/coronavirus-support.

26   [4] https://www.zurich.com/-/media/project/zurich/dotcom/services/docs/coronavirus-support/homeworking-during-covid-19.pdf.

27

28   [5] Jack Howell, CEO, Zurich Asia Pacific, https://insuranceasianews.com/zurichs-jack-howell-on-ma-covid-19-and-wfh/.

COMPLAINT AND DEMAND FOR JURY TRIAL

1  for the people we work with, especially the customers who trust and

2  depend on us."[6]

3  •   "David Henderson, chief human resources officer at Zurich, says that

4  employers' duty of care is vital to the success of the social contract

5  and that companies who protect their workforce – physically,

6  mentally, financially – will be applauded in the post-Covid-19 era. He

7  calls this a 'moment of truth' for all businesses."[7]

8  Unfortunately for AECOM, Zurich has breached the time-honored principle that

9  one's "word is its bond."  In its "moment of truth," Zurich has failed miserably.

10  **ZURICH's KNOWLEDGE OF THE RISK OF PANDEMICS**

11  15.   Zurich and other insurers were repeatedly warned over the years of

12  the potential impact of pandemics.  In fact, there were many publicly available

13  reports about the risks of pandemics and what insurers should do—in the months

14  and years before the outbreak of the COVID-19 pandemic.  For example, one

15  article noted in March 2018:

16  Even with today's technology, a modern severe

17  pandemic would cause substantive direct financial losses

18  to the insurance community.  In addition, indirect losses

19  would be severe, most notably on the asset side of the

20  balance sheet.[8]

21  16.   One insurance industry repository shows the proverbial "tip of the

22  iceberg" about how much information was available to FFIC and other insurers

23  regarding the risk of pandemics.  The Insurance Library Association of Boston,

24

25  [6] https://www.zurichna.com/knowledge/articles/2020/06/covid-19s-business-impact-6-ideas-for-insurance-brokers.

26  [7] https://www.zurich.com/en/knowledge/topics/workforce-protection/building-a-better-social-contract.

27  [8] "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29,

28  2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests."[9]  The Association states on its website:

> The past 20 years [have] seen the rise of a number of pandemics.  Slate recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well.[10]

17.    The Association lists more than 20 articles, reports, and white papers available to insurers from early 2007 through 2018.  One white paper warned in 2009 of a pandemic's consequences to the insurance industry:

> It is highly unlikely that the insurance industry would have the financial reserves to meet the worldwide claims arising out of a pandemic of this size.[11]

18.    Zurich also has known, or should have known, for decades that its policies could be held to cover losses from the presence of a hazardous substance, such as a virus inside buildings or because a building could not be used for its intended purposes or function.  As Zurich has known, or should have known, for decades many courts have held that the presence of a hazardous substance in property, including the airspace inside buildings, constitutes property damage and that there may be "direct physical loss" to property even if the property is not physically damaged.  As Zurich has known, or should have known, the many decisions include the following:

---

[9] http://insurancelibrary.org/about-us/.

[10] http://insurancelibrary.org/pandemics-and-insurance/.

[11] Allan Manning, *White Paper on Infectious Disease Cover* (updated 2009), http://www.lmigroup.com/Documents/Articles/White%20Paper%20on%20Infectious%20Disease%20Cover.pdf?mc_cid=f0cee24803&mc_eid=41023ebc2c.

COMPLAINT AND DEMAND FOR JURY TRIAL

- *AIU Insurance Co. v. Superior Court*, 51 Cal. 3d 807, 842 (1990): "contamination of the environment satisfies" the requirement of property damage.

- *Aetna Casualty & Surety Co. v. Pintlar Co.,* 1948 F.2d 1507, 1514 (9th Cir. 1981): "The insurers further concede that contamination of the soil and water by hazardous substances constitutes injury to property . . . . And an ordinary person would find that the environmental contamination alleged . . . falls within the plain mean of 'property damage' as that term is used in policies."

- *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996): presence of oil fumes in building constituted "physical loss" to building.

- *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.2d 399, 406 (1st Cir. 2009): odor from carpet and adhesive "can constitute physical injury to property."

- *Farmers Ins. Co. v. Trutanich,* 123 Or. App. 6, 9-11 (1993): "[T]he odor produced by the methamphetamine lab had infiltrated the house. The cost of removing the odor is a direct physical loss."

- *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.,* 2014 WL 6675934 (D.N.J. Nov. 25, 2014): closure of facility because of accidentally released ammonia; while "structural alteration provides the most obvious sign of physical damage, . . . property can sustain physical loss or damage without experiencing structural alteration."

- *Matzner v. Seacoast Ins. Co.*, 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998): building with unsafe levels of carbon monoxide sustained direct physical loss.

- *Mellin v. N. Sec. Ins. Co.*, 167 N.H. 544, 550-51 (2015): cat urine odor inside condominium constitutes direct physical loss; "a property

8

policy insures 'physical loss changes to the insured property, but also changes that are perceived by a sense of smell' and 'may exist in the absence of structural damage to the insured property.'"

- *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, 2016 WL 3267247, at \*9 (D. Ore. June 7, 2016):  "smoke infiltration in theatre caused direct property loss or damage by causing the property to be uninhabitable and unusable for its intended purpose."

- *Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002):  property sustained a direct physical loss because it was rendered uninhabitable by the presence of asbestos fibers.

- *Sentinel Mgt. Co. v. Aetna Cas. & Sur. Co.*, 1999 WL 540466, at \*7 (Minn. Ct. App. July 27, 1999):  "If rental property is contaminated by asbestos fibers and presents a health hazard to tenants, its function is seriously impaired."

- *Sentinel Mgt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997):  "Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants. . . .  Under these circumstances, we must conclude that contamination by asbestos may constitute a direct, physical loss to property under an all-risk insurance policy."

- *Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 39-40 (1968):  direct physical loss when gasoline contaminated church building making it dangerous to use.

19.    Because Zurich long has been licensed to sell insurance to California insureds, it has known, or should have known, that a California Court of Appeal

9

1  addressed in 1962—59 years ago—the question of whether a property insurance

2  policy could cover loss or damage to a structure that had no physical damage or

3  alteration.  In *Hughes v. Potomac Insurance Co.,* 199 Cal. App. 2d 239 (1962), the

4  insureds' house had been left partially overhanging a cliff after landslide.  The

5  house suffered no physical damage.  However, the court rejected the insurer's

6  argument that there was no "direct physical loss."  The court explained why, and

7  what an insurer should do if it did not want to cover such losses:

8        Despite the fact that a "dwelling building" might be

9        rendered completely useless to its owners, [the insurer]

10        would deny that any loss or damage had occurred unless

11        some tangible injury to the physical structure itself could

12        be detected.  Common sense requires that a policy should

13        not be so interpreted in the absence of a provision

14        specifically limiting coverage in this manner.  [The

15        insureds] correctly point out that a "dwelling" or

16        "dwelling building" connotes a place fit for occupancy, a

17        safe place in which to dwell or live.  It goes without

18        question that [the insureds'] "dwelling building" suffered

19        real and severe damage when the soil beneath it slid

20        away and left it overhanging a 30-foot cliff.  Until such

21        damage was repaired and the land beneath the building

22        stabilized, the structure could scarcely be considered a

23        "dwelling building"' in the sense that rational persons

24        would be content to reside there.[12]

25       20.    Thus, Zurich has known, or should have known, for decades that its

26  policies would be called upon to pay perhaps hundreds of millions of dollars or

27

28  ───────────────

[12]  *Id.* at 248-49.

1 more to their insureds and, specifically knows that it could be obligated under its

2 policies to pay tens of millions of dollars to AECOM for losses associated with

3 viruses and pandemics.

4      21.    Given the potential liability that insurers, including Zurich, faced

5 under their policies for losses from pandemics, shortly after the outbreak of SARS

6 in 2003, the insurance industry undertook to draft exclusions applicable to losses

7 from viruses and bacteria.  In 2006, the Insurance Services Office, the insurance

8 industry's drafting organization, considered the need to draft an exclusion that

9 would bar coverage for losses caused by a virus.[13]

10      22.    On July 6, 2006, ISO prepared a circular that included a standard

11 exclusion of loss due to viruses and bacteria as part of its filing with state

12 insurance regulators.[14]  In that circular, it noted that examples of "viral and

13 bacterial contaminants are rotavirus, SARS, [and] influenza," observing, "[t]he

14 universe of disease-causing organisms is always in evolution."[15] ISO recognized

15 that viruses could cause property damage, stating:

16           Disease-causing agents may render a product impure

17           (change its quality or substance), or enable the spread of

18           disease by their presence on interior building surfaces or

19           the surfaces of personal property.  When disease-causing

20           viral or bacterial contamination occurs, potential claims

21

---

22 [13] "ISO is a non-profit trade association that provides rating, statistical, and

23 actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are

24 approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for

25 their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal. 4th 645,671 n.13 (1995).

26 [14] *See ISO* Circular, "New Endorsements Filed to Address Exclusion of Loss Due

27 to Virus or Bacteria," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

28 [15] *Id.*

involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.[16]

23.     ISO introduced a standard-form exclusion that it entitled "Exclusion Of Loss Due To Virus Or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).

24.     Thus, Zurich has had a "virus or bacteria" exclusion since 2006 that is approved for use throughout the United States.  As one recent article succinctly stated, "Insurers knew the damage a viral pandemic could wreak on businesses. So they excluded coverage."[17]

25.     However, even though Zurich knew it could be liable for losses from viruses and pandemics if it did not include an appropriate exclusion in its policies, Zurich sold the policies here to AECOM agreeing to delete an exclusion that it otherwise might argue applied to limit coverage available for losses involving a virus.  Specifically, while the policy form that Zurich included in the policies contained an ambiguous Zurich form exclusion that included a "virus [or] disease causing or illness causing agent" as an excluded "contaminant," Zurich included an endorsement deleting the exclusion's reference to a "virus [or] disease causing or illness causing agent."  By doing so, Zurich confirmed its intent to cover losses caused by a virus or other disease-causing agent.  Therefore, Zurich cannot be surprised that AECOM asked it to pay for AECOM's losses.

---

[16] *Id.*

[17] Todd Frankel, "Insurers knew the damage a viral pandemic could wreak on businesses.  So they excluded coverage," *Washington Post* (April 2, 2020).  In the early wave of coverage litigation over losses associated with the pandemic, many insureds and insurers are fighting over whether the standard-form exclusion actually bars coverage, in whole or in part, for those losses.  Only time will tell.

PASICH

1

## THE ZURICH EDGE GLOBAL POLICIES

2   26.   Zurich sold AECOM Zurich EDGE Global Policy, No. PPR6299216-

3   00 for the period of April 1, 2019, to April 1, 2020 and Zurich Edge Global Policy,

4   No. PPR6299216-01 for the period April 1, 2020, to April 1, 2021 (the "Policies").

5   True and correct copies of the Policies are attached hereto as Exhibits A and B and

6   incorporated herein by reference.

7   27.   Zurich introduced its EDGE policies in 2008.  When it did so, it

8   stated:

9   "We listened to our customers and developed a policy that

10   meets their needs," said Mario Vitale, CEO of Zurich's

11   Global Corporate in North America (GCiNA) business

12   unit. "This new policy gives them higher limits, broader

13   coverage and greater flexibility. The Zurich Edge

14   dramatically enhances our ability to serve customers in

15   this important line of business and offers significant

16   advantages for global property programs and global

17   property fronting arrangements.

18   "In addition to being globally compliant, the policy also

19   has the advantage of being offered by Zurich, which is

20   often recognized for offering one of the broadest and most

21   diverse portfolios of products and services in the world,"

22   Vitale said. "The Zurich Edge policy is clearly written

23   with all limits, sub-limits and other critical coverage

24   issues incorporated within the policy declarations and is

25   supported by Zurich's global network of risk engineering

26   and claims professionals."[18]

27

28   [18]http://www.zurichservices.com/zus/zna_config.nsf/pages/9123da88864cd814852
57433006ed710!OpenDocument&Click=.

PASICH

28.     Each of the Policies provides $250,000,000 of insurance, with sublimits for various perils. Unless the Policies otherwise state, these limits of liability apply separately to each **Occurrence**.

29.     The Policies insure AECOM's "interest in buildings (or structures)" and "Personal Property."  Policies ¶¶ 3.01.01 & 3.01.02.

30.     The Policies state in part:

> This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy.
>
> **Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy.

*Id.* ¶¶ 3.03.01 & 3.03.01.01.

31.     The Policies' standard form defines **Contamination (Contaminated)** as

> Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, ***virus, disease causing or illness causing agent***, **Fungus**, mold or mildew.

*Id.* ¶ 7.09 (emphasis added).  However, Zurich agreed in selling the Policies to delete "virus [and] disease causing or illness causing agent" from the definition and thus from what the Policies excluded.  Specifically, Zurich agreed to replace the standard-form definition of excluded **Contamination (Contaminated)** by narrowing the scope of the definition of **Contamination (Contaminated)**.  Zurich changed the definition of **Contamination (Contaminated)** to:

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PASICH

> Any condition of property due to the actual presence of any **Contaminant(s)**.

*Id.*, Amendatory Endorsement – Louisiana, EDGE-219-C (01/18) ¶ 11.  Zurich then defined **Contaminants** not to include "virus, disease causing or illness causing agent."  Specifically, Zurich defined **Contaminants** as

> Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed),  other hazardous substances, **Fungus** or **Spores**.

*Id.*, Amendatory Endorsement – Louisiana, EDGE-219-C (01/18) ¶ 12.  Therefore, while the **Contamination (Contaminated)** exclusion in the policy form included "virus, disease causing or illness causing agent," Zurich amended the Policies to remove viruses and disease-causing or illness-causing agents from the scope of the exclusion.

32.   Furthermore, while the Amendatory Endorsement referenced "Louisiana" in its title, unlike other amendatory endorsements in the Policies, this endorsement did not purport to limit its changes to just risks in Louisiana. Therefore, the endorsement plainly, clearly, and reasonably interpreted is not limited in geographic scope to only risks and losses in Louisiana.

33.   Even if Zurich had not removed "virus, disease causing or illness causing agent" from the scope of the exclusion, the exclusion still would not apply because the efficient proximate (predominant) causes of AECOM's losses cannot be ascribed to "contamination" within the scope of the exclusion and because there are other insured causes of AECOM's loss.  Additionally, the exclusion would not apply to bar coverage because it is a hidden virus exclusion, rather than one that is conspicuous, plain, and clear, and because "contamination" and "contaminant" are not reasonably understood to include a virus or disease.

15

**COMPLAINT AND DEMAND FOR JURY TRIAL**

34.     The Policies have a separate section providing AECOM with "Time Element" insurance.  Its "Loss Insured" provision states in relevant part:

> The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**, or as provided in Off Premises Storage for Property Under Construction Coverages.
>
> The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations. Such other Location must depend on the continuation of business activities at the **Location** that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.

*Id*. ¶ 4.01.01.  A **Covered Cause of Loss** is defined as "All risks of direct physical loss of or damage from any cause unless excluded."  *Id.* ¶ 7.11.

35.     The Policies' "Time Element" section also insures "Extra Expense," obligating Zurich to pay for

> the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability**,** to resume and

16

PASICH

> continue as nearly as practicable the Insured's normal
> business activities that otherwise would be necessarily
> suspended, due to direct physical loss of or damage
> caused by a **Covered Cause of Loss** to Property of the
> type insurable under this policy at a **Location**.

*Id.* ¶ 4.02.03.

36.     The Policies also provide AECOM with "Special Coverages & Described Causes of Loss.  *See id.* § V.

37.     The "Special Coverages" include insurance of "Civil or Military Authority" losses

> resulting from the necessary **Suspension** of the Insured's
> business activities at an Insured Location if the
> **Suspension** is caused by order of civil or military
> authority that prohibits access to the **Location**. That
> order must result from a civil authority's response to
> direct physical loss of or damage caused by a **Covered**
> **Cause of Loss** to property not owned, occupied, leased
> or rented by the Insured or insured under this Policy and
> located within [five miles] of the Insured's Location . . . .

*Id.* ¶ 5.02.03.

38.     The "Special Coverages" include insurance for "Contingent Time Element" losses that AECOM suffers because of "direct physical loss of or damage to" third-party property.  *Id.* ¶ 5.02.05.

39.     The "Special Coverages" include "Ingress/Egress" losses that AECOM suffers when

> ingress or egress to [an] Insured Location by [its]
> suppliers, customers or employees is prevented by
> physical obstruction due to direct physical loss of or

**COMPLAINT AND DEMAND FOR JURY TRIAL**

> damaged caused by a **Covered Cause of Loss** to
> property not owned, occupied, leased or rented by
> [AECOM] or insured under this Policy and located
> within [5 miles] of the Insured Location . . . .

*Id.* ¶ 5.02.15.

40.    The "Special Coverages" include insurance for "Protection and Preservation of Property."  Specifically, the Policies state that they cover

> [t]he reasonable and necessary costs incurred for actions
> to temporarily protect or preserve Covered Property;
> provided such actions are necessary due to actual or
> imminent physical loss or damage due to a **Covered**
> **Cause of Loss** to such Covered Property; and [t]he
> Gross Earnings loss or Gross Profit loss sustained by the
> Insured for a period of time not to exceed [48 hours]
> prior to and after the Insured first taking reasonable
> action for the temporary protection and preservation of
> Covered Property.

*Id.* ¶¶ 5.02.23.01 & 5.02.23.02.

41.    The Policies provide a range of other coverages for losses, which also may apply.

42.    None of the Policies' exclusions bar coverage for AECOM's losses because the efficient proximate causes of those losses are covered under the terms of the "all-risk" policy and are not conspicuously, plainly, and clearly excluded.

## <u>ZURICH'S BREACHES AND WRONGFUL CONDUCT</u>

43.    In December 2019, SARS-CoV-2 and COVID-19 broke out in Wuhan, China.  Since then, SARS-CoV-2 and COVID-19 have spread throughout the world, prompting the World Health Organization to declare a global pandemic.

44.    As explained by the World Health Organization,

**COMPLAINT AND DEMAND FOR JURY TRIAL**

People can catch COVID-19 from others who have the [SARS-CoV-2] virus. The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales. These droplets land on objects and surfaces around the person. Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth. People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets.[19]

45.    The spread of SARS-CoV-2 is insidious because it can be readily transmitted by asymptomatic individuals—and approximately 40% of all individuals who have COVID-19 are asymptomatic.[20]  Furthermore, pre-symptomatic persons carry the greatest viral-load (i.e., the quantity of virus in an individual's system) among all infected persons, meaning their ability to transmit SARS-CoV-2 is greater than that of symptomatic persons.[21]

46.    Aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in air and infective for 16 hours, until gravity ultimately forces them to the nearest surface.[22]  Studies have reported that

---

[19] *See* https://www.who.int/news-room/q-a-detail/q-acoronaviruses.

[20] Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says,*  Business Insider (Jul 12, 2020). https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7.

[21] Xi He, *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 ("We detected high viral loads soon after symptom onset, which then gradually decreased towards the detection limit at about day 21. . . . Our analysis suggests that viral shedding may begin 5 to 6 days before the appearance of the first symptoms. After symptom onset, viral loads decreased monotonically, consistent with two recent studies.")

[22] *See* Leslie Tate, *Virus Survives In Air For Hours,* Tulanian (Fall 2020), https://tulanian.tulane.edu/fall-2020/virus-survives-in-air-for-hours.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PASICH

1   SARS-CoV-2 can remain on surfaces for at least 28 days.[23]  These droplets thus

2   physically alter the air and airspace in which they are present and the surfaces to

3   which they attach.  By doing so, they also render property unusable for its intended

4   purpose and function and require further physical alterations, such as installation

5   of physical barriers restricting the movement of the aerosolized droplets.

6       47.    Since January 1, 2020, and as of the date of the filing of this

7   Complaint, there have been more than 89,000,000 confirmed cases of COVID-19

8   throughout the world, more than 1,900,000 of which have resulted in deaths.[24]

9   Moreover, due in part to the initial absence of available tests, it is believed that the

10  true number of coronavirus cases is significantly higher than the reported numbers

11  might suggest.[25]

12      48.    Since the outbreak of SARS-Cov-2 and COVID-19, and in response

13  thereto, civil authorities throughout the world issued "stay-at-home" and "shelter

14  in place" orders, travel restrictions, quarantines, and other orders, including orders

15  requiring the suspension of non-essential business operations.

16      49.    AECOM has locations, offices, operations, and projects around the

17  world.  To date, more than 500 AECOM employees throughout the world have

18  tested positive for COVID-19.  Thus, there is no doubt that SARS-CoV-2 was

19  present, or at least potentially present, at many of AECOM's locations, offices,

20  operations, and projects that remained open throughout the world.

21

22

_____

23  [23] *See, e.g.,* CNBC, *Virus that causes Covid-19 can survive for 28 days on common

24  surfaces, research says* (Oct. 12, 2020), https://www.cnbc.com/2020/10/12/virus-that-causes-covid-19-can-survive-for-28-days-on-surfaces-research-says.html;

25  Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles, & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17

26  Virology J., Art. No. 145 (2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7.

27  [24] *See* https://covid19.who.int/.

28  [25] *See* https://www.nbcnews.com/health/health-news/how-many-people-have-had-coronavirus-no-symptoms-n1187681.

COMPLAINT AND DEMAND FOR JURY TRIAL

50.    Though microscopic, SARS-CoV-2—like all viruses—is a physical substance.  The virus is highly contagious and mobile.  The SARS-CoV-2 virus spreads from person to person primarily through fine aerosolized droplets containing the virus.  These aerosolized droplets are expelled into the air when infected individuals breathe, talk, sing, cough, or sneeze.  Their presence in the air and airspace constitutes a physical alteration to the air and airspace, constituting physical damage.  Once released, these droplets can physically rest and remain on surfaces of objects or materials for at least 28 days.  Human contact with the air, airspace, and surfaces can lead to transmission of the virus, making it very dangerous for individuals to come in contact with property contaminated by the SARS-CoV-2 virus.  This is a particular concern for places of employment and places open to the public, which contain numerous common touchpoints and areas, such as door handles and bathrooms, with surfaces that are used by multiple people every day.

51.    Aerosolized droplets expelled by individuals with COVID-19 also can linger suspended in the airspace of buildings for up to 16 hours.  Scientists have likened the ubiquitous aerosolized droplets of the virus to smoke, present in the air long after the source of its dissemination has gone.[26]  Thus, entering a building or other location where the SARS-CoV-2 virus is physically present in the air poses an imminent and severe risk to human health.

52.    Because SARS-CoV-2 attaches to surfaces, lingers in the air and airspace of buildings, and can move through HVAC systems to spread throughout buildings, the presence of SARS-CoV-2 causes a distinct, demonstrable, physical alteration to property, thus causing "direct physical loss of or damage to property" as that phrase is used in the Policies.[27]  Just like invisible pollution in water *alters*

---

[26] *See* "Airborne Transmission of SARS-CoV-2," *Science* (Oct. 16, 2020), available at https://science.sciencemag.org/content/370/6514/303.2.

[27] *See* Jianyun Lu & Zhicong Yang, *COVID-19 outbreak associated with air*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

the water, the presence of the SARS-CoV-2 virus **alters** the air and airspace in which it is found and the property on which it lands.  In fact, the presence of SARS-CoV-2-causes a physical transformation of the air and surfaces.  It changes the air and the surfaces into dangerous transmission mechanisms for SARS-CoV-2, rendering the affected property unsafe, unfit and uninhabitable for ordinary functional use.

53.    SARS-CoV-2 spreads by property- or surface-to-person transmission when an uninfected person touches an object or surface that has come into contact with the discharges of an infected person, and the uninfected person then touches their eyes, nose, or mouth.[28]  Once surfaces are physically affected by SARS-CoV-2, they are referred to as fomites.[29]  Fomites consist of both porous and nonporous surfaces or objects that can become infected with a virus and serve as vehicles of transmission.[30]

54.    Because COVID-19 is a global pandemic and SARS-CoV-2 is statistically certain to be carried by a number of individuals who visit AECOM's locations, SARS-CoV-2 is continually reintroduced to the air, airspace, and surfaces of AECOM's properties and the property of third parties.

---

*conditioning in restaurant, Guangzhou, China, 2020*, 26 Emerging Infectious Diseases 11 (Sep. 11, 2020), https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation ("We conclude that the air conditioner prompted transmission of SARS-CoV-2; the customers in the airflow were at high risk for infection with SARS-CoV-2 in the poorly ventilated environment.

[28] *Zeynep* Tufeckci, *We Need to Talk About Ventilation*, The Atlantic (July 30, 2020), https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/614737/; National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England Journal of Medicine (2020), https://www.nejm.org/doi/full/10.1056/nejmc2004973.

[29] Stephanie A. Boone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, American Society for Microbiology (Mar. 13, 2007) (https://aem.asm.org/content/73/6/1687).

[30] *Id.*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

55. As SARS-CoV-2 and COVID-19 spread around the world, AECOM suffered loss and damage covered by the Policies. Indeed, SARS-CoV-2 and the resulting government closure orders physically altered and impaired the functioning of the tangible, material dimensions of AECOM's property. This is especially true when, as here, property has been rendered partially or wholly nonfunctional for its intended purpose as a result of the presence of SARS-CoV-2, the pandemic, and the government closure orders, and when AECOM has had to take, and will need to continue to take, steps that involve physical alterations to its insured locations, including installation of transmission-restricting barriers and devices and redesigns to accomplish physical spacing and distancing.

56. AECOM timely notified Zurich and, over the course of several months, provided Zurich with information about its losses.

57. On May 6, 2020, AECOM representatives spoke with John Harmon, Zurich's Supervisor International Property Claims and its designated representative, providing additional information about AECOM's losses.

58. On May 7, 2020, Mr. Harmon sent an e-mail to AECOM, providing a "a recap of the information shared" by AECOM, summarizing it in part as follows:

- AECOM provides multinational design and consulting engineering services to major clients globally.

- AECOM has a total of 800 offices with 350 in North America and 450 outside of North America

- Insured is claiming revenue loss throughout the global network including Asia, Europe and the Middle East. Additionally, several hundred projects were shut down.

- Some offices were closed (China and Hong Kong). In some offices, services were deemed essential and did not close. Whether offices were closed depends on the circumstances of each office. Some offices are working remotely.

23

- More than 100 employees tested positive at various offices globally for COVID-19.

- Insured counsel representative stated that there was no physical damage in regards to structural damage to any of the buildings. However, counsel stated that physical damage was quite evident with presence of the virus.

- Insured is gathering the information and will submit a detailed claim submission including a spreadsheet of all locations impacted in the upcoming weeks/months.

59. On May 11, 2020, AECOM responded, correcting certain aspects of Mr. Harmon's "recap" as follows:

- AECOM provides multinational design and consulting engineering services to major clients globally. AECOM also provides real estate development, construction and construction management services. Please reference aecom.com for a full range of services.

- AECOM has ~~a total of~~ under 800 offices with ~~350~~ 343 in the US, Puerto Rico and USVI ~~North America~~ and ~~450~~ 436 non-US locations ~~outside of North America~~

- Insured is claiming revenue loss ~~throughout the~~ from its global network throughout the Americas, EMEA and APAC regions. ~~Asia, Europe and the Middle East.~~ Additionally, ~~several~~ over 650 projects ~~have been were shut down~~ were closed as of last week. This does not include prior closures that have been reopened.

- Some offices were closed (China and Hong Kong are two examples, but the full scope of closures is being compiled). In some offices, services were deemed essential and did not close. Whether offices were closed depends on the circumstances of each office. Some offices are working remotely.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

- As of last week, more than 100 employees tested positive at various offices globally for COVID-19.
- Insured counsel representative stated that there was no physical damage in the sense of structural damage to any of the buildings. However, counsel stated that physical loss or damage was quite evident with presence of the virus.
- Insured is gathering the information and will submit a detailed claim submission including a spreadsheet of all locations impacted in the upcoming weeks/months. AECOM will be submitting claims for locations as they become available.

60.     AECOM and Zurich continued to communicate thereafter about AECOM's claim.

61.     On August 18, 2020, AECOM's representatives engaged in a WebEx meeting with Mr. Harmon and Zurich's coverage counsel. During that meeting, AECOM presented Zurich with "**AECOM – Mainland China Offices** Interim Time Element Insurance Claim Resulting from Lockdowns in China Caused by COVID." AECOM also shared with Zurich a written copy of its presentation.

62.     On August 23, 2020, Mr. Harmon acknowledged receipt of the presentation and posed a few questions for clarification. He also stated:

> Zurich maintains its position that the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage and will advise in the official coverage determination communication.

63.     By September AECOM still had not received Zurich's promised "official coverage determination communication." Therefore, AECOM sent an e-mail to Mr. Harmon stating, in relevant part:

> We wanted to circle back to your previous questions:

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1)  Please note that there are other countries and regions
    where AECOM's businesses have been affected by
    COVID besides China.  At this time, we are still
    collecting and reviewing the impact.  We will be
    submitting these losses in addition to the China/HK
    claim.

2)  Regarding the infection rate, this is based on internal
    reporting, not the CDC's 10% infection modeling rate.

3)  Finally, physical alterations were and continue to be
    undertaken and AECOM intends to submit the losses
    associated with such as part of its claim.

Please advise the timing of Zurich's official coverage
determination, and whether you have any other
questions.  Thank you.

64.    On October 13, 2020, Zurich finally provided AECOM with its
coverage position.  Mr. Harmon stated that Zurich has "completed review of this
file and conclude that occurrence is not covered under the global program, both
local and master policies.  We are therefore proceeding to deny coverage at this
time."   Specifically, Mr. Harmon stated:

[T]he Policy does not provide coverage for AECOM's
claim. In short, AECOM's claim . . .  does not establish a
physical loss or damage of the type insured by the
Policy. The Policy, under the Property Damage coverage
part, insures risks of direct physical loss or damage
which is not excluded by the Policy. AECOM's claim,
which is based on slow-downs or closures due to actual
or suspected spread of the SARS-CoV-2 virus, which
causes the disease COVID-19, or governmental orders

26

issued to prevent the spread of COVID-19, is not due to direct physical loss or damage.

65. Mr. Harmon further stated:

In addition, if or to the extent AECOM claims that the presence of the SARS-CoV-2 virus on or in tangible property constitutes contamination of that property, AECOM's claim would in any event be excluded by the Contamination exclusion in the Policy, which specifically excludes any condition of property due to the actual presence of any virus, or other disease causing or illness causing agent.

66. AECOM is entitled to the maximum amounts of coverage needed to indemnify it for its losses for the maximum periods of time provided by and under the Policies.

67. To the extent not waived or otherwise excused, AECOM has complied with the provisions contained in the Policies. Therefore, AECOM is entitled, on behalf of itself and all other insureds, to all benefits of insurance provided by the Policies.

68. As a direct result of Zurich's breaches, AECOM has suffered and will continue to suffer millions of dollars in damages. Zurich is liable for these damages.

## FIRST CAUSE OF ACTION

### (Breach of Contract—2019-20 Policy)

69. AECOM realleges and incorporates by reference paragraphs 1 through 68 above.

70. By acting as alleged above, by denying coverage, and by failing to agree to pay, let alone pay AECOM for the insured losses, Zurich breached its duties under the 2019-20 Policy.

27

71.    As a direct and proximate result of Zurich's breaches, AECOM has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.  AECOM will seek leave to amend this Complaint once it ascertains the full extent of its damages.

## SECOND CAUSE OF ACTION

### (Anticipatory Breach of Contract—2019-20 Policy)

72.    AECOM realleges and incorporates by reference paragraphs 1 through 68 above.

73.    By acting as alleged above, by stating that "Zurich maintains its position that the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage," and by failing to agree that it will pay for any part of AECOM's losses, Zurich has clearly stated that it will not meet or perform its obligations under the 2019-20 Policy and will not pay for AECOM's losses. Zurich has done so even though AECOM has fully cooperated with Zurich in its investigation, fully answered the questions posed by Zurich, and AECOM has indicated that it is willing to perform any obligations that it might have under the 2019-20 Policy to the extent not waived or excused.  AECOM is, in fact, prepared and ready to perform any such obligations.

74.    Therefore, to the extent that any aspect of Zurich's acts and omissions is not deemed to constitute a breach of the 2019-20 Policy, they constitute an anticipatory breach of the 2019-20 Policy.

75.    As a direct and proximate result of Zurich's acts and omissions, AECOM has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.  AECOM will seek leave to amend this Complaint once it ascertains the full extent of its damages.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**THIRD CAUSE OF ACTION**

**(Anticipatory Breach of Contract—2020-21 Policy)**

76.     AECOM realleges and incorporates by reference paragraphs 1 through 68 above.

77.     By acting as alleged above, by stating that "Zurich maintains its position that the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage," and by failing to agree that it will pay for any part of AECOM's losses under the 2019-20 Policy, Zurich has clearly stated that it will not meet or perform its obligations under the Policies and will not pay for AECOM's losses.  Zurich has done so even though AECOM has fully cooperated with Zurich in its investigation, fully answered the questions posed by Zurich, and AECOM has indicated that it is willing to perform any obligations that it might have under the Policies to the extent not waived or excused.  AECOM is, in fact, prepared and ready to perform any such obligations.

78.     AECOM is informed and believes that given Zurich's denial of coverage under the 2019-20 Policy, Zurich will deny coverage for AECOM's claim under the 2020-21 Policy and refuse to meet and perform its obligations under the 2020-21 Policy as well.

79.     Therefore, Zurich's acts and omissions constitute an anticipatory breach of the 2020-21 Policy.

80.     As a direct and proximate result of Zurich's acts and omissions, AECOM has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.  AECOM will seek leave to amend this Complaint once it ascertains the full extent of its damages.

**FOURTH CAUSE OF ACTION**

**(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)**

81.     AECOM realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 68, 70, 73, 74, 77, 78, and 79 above.

29

82.   Implied in the Policies is a covenant that Zurich would act in good faith and deal fairly with AECOM, that Zurich would do nothing to interfere with the rights of AECOM to receive the benefits due under the Policies, and that Zurich would give at least the same level of consideration to AECOM's interests as it gives its own interests.

83.   Zurich also had a duty under the Policies, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under its Policies.

84.   Instead of complying with these duties, Zurich acted in bad faith by, among other things,

a.   Adopting the position that "the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage" in spite of its prior knowledge of the risks of losses associated with pandemics, its knowledge of court decisions recognizing that the presence of a hazardous substance in a building or its airspace could constitute "direct loss of or damage to property," its failure to include the standard ISO "virus or bacteria exclusion," its deletion of "virus" from its definition of **Contaminants(Contaminated)**, and its failure to consider, let alone meaningfully investigate, the possibility that perils other than a conspicuously, plainly, and excluded peril may be the efficient proximate cause of AECOM's losses;

b.   Unreasonably failing and refusing to honor its promises and representations;

c.   Putting its interests above that of its insured; and

d.   Otherwise acting as alleged above.

85.   In breach of the implied covenant of good faith and fair dealing, Zurich committed the acts alleged above for the purpose of knowingly withholding from AECOM the rights and benefits to which it is and was entitled under the Policies.

COMPLAINT AND DEMAND FOR JURY TRIAL

86.    Zurich's acts are inconsistent with the reasonable expectations of AECOM, are contrary to established industry custom and practice, are contrary to the express and implied terms of the Policies and constitute bad faith.

87.    As a direct and proximate result of Zurich's breach of the implied covenant of good faith and fair dealing, AECOM has sustained, and continues to sustain, damages in an amount in excess of this Court's jurisdictional limit to be proven at trial.  Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), AECOM is entitled to recover all attorneys' fees that it has reasonably incurred, and continues to incur, in its efforts to obtain the benefits due under the Policies that Zurich wrongfully has withheld, and is withholding, in bad faith.  AECOM is entitled to interest thereon at the maximum legal rate.  AECOM continues to suffer damages because of Zurich's bad faith and will seek to amend this Complaint once it ascertains the full extent of its damages.

88.    AECOM is informed and believes, and on that basis alleges, that Zurich, acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of Zurich's business, performed, authorized, and/or ratified the bad faith conduct alleged above.

89.    Zurich's conduct is contemptible and has been done with a conscious disregard of AECOM's rights, constituting oppression, fraud, and/or malice. Zurich has engaged in a series of acts designed to deny AECOM of the benefits due under the Policies.  Specifically, Zurich, by acting alleged above, consciously disregarded AECOM's rights and forced AECOM to incur substantial financial losses, thereby inflicting substantial financial damage on AECOM.  Zurich ignored AECOM's interests and concerns with the requisite intent to injure within the meaning of California Civil Code section 3294.  Therefore, AECOM is entitled to recover punitive damages from Zurich in an amount sufficient to punish and make an example of Zurich and to deter similar conduct in the future.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

# FIFTH CAUSE OF ACTION

## (Declaratory Relief)

90.    AECOM realleges and incorporates by reference herein each allegation contains in paragraphs 1 through 68 above.

91.    AECOM contends that it is entitled to coverage for its losses under the Policies and that its contentions stated above are correct.

92.    AECOM is informed and believes, and on that basis alleges, that Zurich disputes AECOM's contentions and contends that AECOM is not entitled to coverage under the Policies for any of its losses.

93.    Therefore, an actual and justiciable controversy exists between AECOM and Zurich concerning the matters alleged herein.

94.    AECOM seeks a judicial declaration by this Court in accord with its contentions and rejecting Zurich's contentions and stating that AECOM's losses are insured under the Policies.

95.    A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their prospective rights and duties.

# PRAYER FOR RELIEF

WHEREFORE, AECOM prays for relief as follows:

## ON THE FIRST CAUSE OF ACTION

1.    For damages, plus interest, according to proof at the time of trial;

## ON THE SECOND CAUSE OF ACTION

2.    For damages, plus interest, according to proof at the time of trial;

## ON THE THIRD CAUSE OF ACTION

3.    For damages, plus interest, according to proof at the time of trial;

## ON THE FOURTH CAUSE OF ACTION

4.    For damages, including reasonable attorneys' fees plus interest, according to proof at the time of trial;

COMPLAINT AND DEMAND FOR JURY TRIAL

5.    For punitive damages in an amount to be determined at the time of trial;

### ON THE FIFTH CAUSE OF ACTION

6.    For a declaration in accord with AECOM's contentions;

### ON ALL CAUSES OF ACTION

7.    For costs of suit incurred herein; and

8.    For such other, further, and/or different relief as may be just and proper.

DATED:  January 11, 2021                PASICH LLP

                                        By:    _/s/ Sandra Smith Thayer_
                                               Sandra Smith Thayer

                                               Attorneys for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL

1

## <u>DEMAND FOR JURY TRIAL</u>

2      Plaintiff AECOM hereby demands a trial by jury in this action.

3   DATED:  January 11, 2021              PASICH LLP

4

5                                        By:    */s/ Sandra Smith Thayer*
                                                Sandra Smith Thayer

6                                        Attorneys for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28