Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Sandra Smith Thayer (SBN 200294)
SThayer@PasichLLP.com
Caitlin S. Oswald (SBN 330974)
COswald@PasichLLP.com
PASICH LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7860
Facsimile:   (424) 313-7890

Jacquelyn M. Mohr (SBN 278337)
JMohr@PasichLLP.com
PASICH LLP
1230 Rosecrans Avenue, Suite 690
Manhattan Beach, California 90266
Telephone:  (424) 313-7860
Facsimile:   (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AECOM, a Delaware corporation, | Case No. 2:21-cv-00237-JAK-MRW |
| Plaintiff, | Assigned to Hon. John A. Kronstadt |
| vs. | **PLAINTIFF AECOM'S FIRST AMENDED COMPLAINT** |
| ZURICH AMERICAN INSURANCE COMPANY, a New York corporation, | |
| Defendant. | Complaint Filed on January 11, 2021 |

Plaintiff AECOM hereby complains of defendant Zurich American Insurance Company and alleges as follows:

## NATURE OF THIS LAWSUIT

1. AECOM is the world's premier infrastructure consulting firm. It provides planning, design, engineering, consulting, and construction management services around the world. Given its global operation, it purchased broad, "all risk" EDGE Global property insurance policies from Zurich (the "Policies"). Among other things, the Policies promised coverage for AECOM's economic losses from all risks not expressly excluded. Even though the insurance industry has had a standard-form "virus and bacteria" exclusion since 2006 and various forms of pandemic exclusions, Zurich sold its Policies without including either form of exclusion.

2. After the outbreak of SARS-CoV-2, AECOM was forced to significantly alter its business operations worldwide in response to SARS-CoV-2, COVID-19, the resulting actions and orders of government authorities, and the need to mitigate loss and damage. Specifically, AECOM was forced to close, wholly or partly, many of its locations, offices and project sites. AECOM incurred significant expenses to modify its other locations, offices, and project sites to ensure the safety of its employees and mitigate the damage caused by SARS-CoV-2. AECOM is informed and believes, and on that basis alleges, that SARS-CoV-2 was present on AECOM's properties and the properties of others, thereby physically altering air, airspace, and surfaces and preventing AECOM from using its properties for their intended purpose and function. As a consequence, AECOM suffered loss and damage covered by the Policies.

3. Additionally, as a result of SARS-CoV-2, COVID-19, and the subsequent civil authority orders, including orders limiting ingress and egress, local businesses on which AECOM depends, including AECOM's customers, suppliers, and vendors, have been forced to suspend their operations and/or had the

1  use and functionality of their property substantially impaired. This further

2  exacerbated and compounded AECOM's substantial financial losses.

3      4.    Therefore, AECOM turned to Zurich for the coverage Zurich

4  promised. However, even though it had decided by March 2020 not to pay for

5  losses associated with the pandemic, Zurich delayed for months in telling AECOM

6  its coverage position. In fact, even though Zurich represented on August 23, 2020,

7  that it would provide its "official coverage determination communication," Zurich

8  did not provide its final coverage position until October 13, 2020, more than six

9  months after AECOM first notified Zurich of the claim. Instead of agreeing to pay

10  AECOM for any part of its millions of dollars of insured loss, Zurich denied

11  coverage.

12      5.    AECOM is informed and believes, and on that basis alleges, that

13  Zurich has taken, and is taking, a similar position with other insureds, having

14  adopted a corporate-wide position that deprives AECOM and its other insureds of

15  hundreds of millions of dollars of promised insurance. AECOM is informed and

16  believes, and on that basis alleges, that Zurich has done so, and is doing so, to

17  protect its financial interests at the expense of its insureds' interests and with

18  conscious disregard and disdain for the rights, interests, and reasonable

19  expectations of its insureds, including AECOM.

20      6.    Zurich's conduct constitutes a breach of the Policies and violates the

21  implied covenant of good faith and fair dealing. By this lawsuit, AECOM seeks

22  recovery for the damages Zurich has inflicted upon it by its wrongful conduct.

23  AECOM also seeks declaratory relief confirming that Zurich must honor the terms

24  of its Policies.

25                    **JURISDICTION AND VENUE**

26      7.    The Court has subject matter jurisdiction to hear this case under 28

27  U.S.C § 1332 based on complete diversity of citizenship between the parties and

28

PASICH

1  because the amount in controversy, exclusive of the costs and interest, exceeds

2  $75,000.

3       8.    The Court has personal jurisdiction over Zurich because Zurich is

4  licensed to transact, and transacts, business in the State of California and this

5  District.

6       9.    Venue is proper in this District because a substantial part of the

7  events giving rise to AECOM's claims occurred in this District, including

8  negotiations regarding the Policies and the issuance of the Policies through an

9  insurance broker located at 725 S. Figueroa Street, Los Angeles.

10                              **THE PARTIES**

11      10.   AECOM is a corporation organized and existing under the laws of the

12  State of Delaware with its principal place of business in Los Angeles, California.

13  AECOM is authorized to pursue this action, and to collect, on behalf of all of its

14  affiliates and subsidiaries that are insured under the policies at issue herein.

15      11.   AECOM is ranked No. 1 in *Engineering News-Record*'s 2020 "Top

16  200 Environmental Firms," is ranked No. 1 in *Engineering News-Record*'s 2020

17  "Top 500 Design Firms," and has been named by *Fortune* magazine as one of the

18  "World's Most Admired Companies" for six consecutive years. Among its projects

19  around the world, AECOM (and its various companies) is part of the joint venture

20  that led the development and construction of SoFi Stadium, one of the world's

21  largest stadium complexes, and is designing all elements of Victoria's largest-ever

22  public transport project, leading the design of the Inglewood Basketball &

23  Entertainment Center (the future home of the Los Angeles Clippers), and led repair

24  efforts for the Virgin Islands Housing Finance Authority Emergency Home

25  Repairs Program after Hurricanes Irma and Maria.

26      12.   Zurich is a corporation organized and existing under the laws of the

27  State of New York with its headquarters in Schaumburg, Illinois. Zurich is a part

28  of the Zurich Insurance Group of Companies. AECOM is informed and believes,

4

PASICH

1    and on that basis alleges that Zurich is owned by Zurich Holding Company of

2    America and that its ultimate parent is Zurich Insurance Group Ltd.

3         13.    Zurich and the other members of the Zurich Insurance Group Ltd.

4    brand hold themselves out to the public as the Zurich Insurance Group.  They

5    maintain a worldwide website at https://www.zurich.com.  The Zurich Insurance

6    Group makes various statements and representations on its website on behalf of its

7    member companies, including Zurich.

8         14.    According to the Zurich Insurance Group website, the Zurich

9    Insurance Group "is a leading multi-line insurer that serves its customers in global

10   and local markets. With about 55,000 employees, it provides a wide range of

11   property and casualty, and life insurance products and services in more than 215

12   countries and territories."[1]

13        15.    On its website, the Zurich Insurance Group proclaims:

14               Our heritage is about helping customers understand and

15               protect themselves from risk. Since 1872 we have been

16               applying our expertise and experience so that our

17               customers can have the very best protection for the things

18               they value. This is our mission and the timeless idea

19               behind our brand. It is also the authentic truth that has

20               been and always will be at the heart of the Zurich brand.[2]

21        16.    Since the outbreak of the COVID-19 pandemic, the Zurich Insurance

22   Group has made wide-ranging representations.  The following are some of the

23   many representations and promises that the Zurich Insurance Group has made, and

24   still makes as of the date of the filing of this lawsuit:

25               •    "As a society, we are facing unprecedented challenges that are

26

27   [1] https://www.zurich.com/en/about-us/a-global-insurer (last visited Mar. 5, 2021).

28   [2] https://www.zurich.com/en/about-us/a-global-insurer/our-brand (last visited Mar.
     5, 2021).

**FIRST AMENDED COMPLAINT**

immediate and will have long-lasting implications. At Zurich, responding to these challenges goes to the heart of our purpose as a business, and our promise to customers."[3]

- "The spread of Coronavirus (Covid-19) is unprecedented and we understand this is an incredibly difficult time for families and businesses. We are here to help customers and businesses who are affected by the impact of Covid-19 in these challenging times."[4]

- "Customers buy insurance for times like these. They want to know that there is a strong financial institution backing them up when they are in need."[5]

- "Our customers need us now more than ever.  It's a challenging time for everyone, everywhere, both personally and professionally. How we in the insurance sector react in a crisis can make all the difference for the people we work with, especially the customers who trust and depend on us."[6]

- "David Henderson, chief human resources officer at Zurich, says that employers' duty of care is vital to the success of the social contract and that companies who protect their workforce – physically, mentally, financially – will be applauded in the post-Covid-19 era. He calls this a 'moment of truth' for all businesses."[7]

Unfortunately for AECOM, Zurich has breached the time-honored principle that

---

[3] https://www.zurich.com/services/coronavirus-support (last visited Mar. 5, 2021).

[4] https://www.zurich.com/-/media/project/zurich/dotcom/services/docs/coronavirus-support/homeworking-during-covid-19.pdf (last visited Mar. 5, 2021).

[5] Jack Howell, CEO, Zurich Asia Pacific, https://insuranceasianews.com/zurichs-jack-howell-on-ma-covid-19-and-wfh/ (last visited Mar. 5, 2021).

[6] https://www.zurichna.com/knowledge/articles/2020/06/covid-19s-business-impact-6-ideas-for-insurance-brokers (last visited Mar. 5, 2021).

[7] https://www.zurich.com/en/knowledge/topics/workforce-protection/building-a-better-social-contract (last visited Mar. 5, 2021).

one's "word is its bond." In its "moment of truth," Zurich has failed miserably.

## ZURICH'S KNOWLEDGE OF THE RISK OF PANDEMICS

17.   Zurich long has known the risks that viruses and pandemics present. Indeed, Zurich's 2019 Global Risks Report—published before Zurich sold the Policies to AECOM— contains an entire chapter dedicated to the potential threat of viruses and pandemics, ranking the "spread of infectious diseases" as one of the Top 10 Risks in terms of potential impact.[8]  Zurich's  Global Risks Report warns:

> The world is badly under-prepared for even modest biological threats. We are vulnerable to potentially huge impacts on individual lives, societal well-being, economic activity and national security . . . . Progress has made us complacent about conventional threats, but nature remains capable of 'innovating' a pandemic that would cause untold damage.[9]

18.   Zurich's Global Risks Report continues:

> In the past, naturally emerging infectious diseases have caused extraordinary health, economic and security impacts—often assisted by propitious conditions created by changing patterns of human behavior. Many years of global headlines have made various threats familiar: Ebola, MERS, SARS, Zika, yellow fever and each year's strains of influenza. . . .
>
> The frequency of disease outbreaks has been rising steadily. Between 1980 and 2013 there were 12,012

---

[8] Global Risks Report 2019, available for download at https://www.zurich.com/en/knowledge/topics/global-risks/the-global-risks-report-2019.

[9] Id.

**FIRST AMENDED COMPLAINT**

PASICH

1  recorded outbreaks, comprising 44 million individual

2  cases and affecting every country in the world. . . .

3  **Globalization has made the world more vulnerable to**

4  **societal and economic impacts from infectious disease**

5  **outbreaks**. . . .

6  One estimate of potential pandemics through the 21st

7  century puts the annualized economic costs at US$60

8  billion. Including the imputed value of life years lost,

9  another estimate puts the cost of pandemic influenza alone

10  at US$570 billion per year— the same order of magnitude

11  as climate change. . . .

12  *[A]nother way of looking at the outbreaks since 2000 is*

13  *as a "roll call of near-miss catastrophes", which should*

14  *be prompting increased vigilance but is instead lulling us*

15  *into complacency*. . . .[10]

16  19.    Zurich and other insurers were repeatedly warned over the years of

17  the potential impact of pandemics.  In fact, in addition to Zurich's Global Risk

18  Report, there were many other publicly available reports about the risks of

19  pandemics and what insurers should do—in the months and years before the

20  outbreak of the COVID-19 pandemic.  For example, one article noted in March

21  2018:

22  Even with today's technology, a modern severe pandemic

23  would cause substantive direct financial losses to the

24  insurance community.  In addition, indirect losses would

25  be severe, most notably on the asset side of the balance

26

27  ――――――――――――――
[10] *Id*. (emphasis added).

28

**FIRST AMENDED COMPLAINT**

1   sheet.[11]

2   20.   One insurance industry repository shows the proverbial "tip of the

3   iceberg" about how much information was available to FFIC and other insurers

4   regarding the risk of pandemics.  The Insurance Library Association of Boston,

5   founded in 1887, describes itself as "the leading resource for and provider of

6   literature, information services, and quality professional education for the

7   insurance industry and related interests."[12]  Similar to Zurich's own warnings in

8   the Global Risks Report, the Association states on its website:

9           The past 20 years [have] seen the rise of a number of

10          pandemics.  Slate recently published an article on what

11          has been learned about treating them in that time. We

12          thought it might be apt for us to take a look back and see

13          what the insurance industry has learned as well.[13]

14  21.   The Association lists more than 20 articles, reports, and white papers

15  available to insurers from early 2007 through 2018.  One white paper warned in

16  2009 of a pandemic's consequences to the insurance industry:

17          It is highly unlikely that the insurance industry would

18          have the financial reserves to meet the worldwide claims

19          arising out of a pandemic of this size.[14]

20  22.   Zurich also has known, or should have known, for decades that its

21  policies could be held to cover losses from the presence of a hazardous substance,

22  such as a virus inside buildings or because a building could not be used for its

23

24  _____

25  [11] Narges Dorroltaj, Ph.D, *et al*, *What the 1918 Flu Pandemic Can Teach
    Today's Insurers*, AIR (Mar. 29, 2018), https://www.air-
26  worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-
    Teach-Today-s-Insurers/.

27  [12] https://insurancelibrary.org/about/ (last visited Mar. 5, 2021).

28  [13] http://insurancelibrary.org/pandemics-and-insurance/(last visited Mar. 25, 2021).
    [14] Allan Manning, *White Paper on Infectious Disease Cover* (updated 2009).

intended purposes or function.  As Zurich has known, or should have known, for
decades many courts have held that the presence of a hazardous substance in
property, including the airspace inside buildings, constitutes property damage and
that there may be "direct physical loss" to property even if the property is not
physically damaged.  As Zurich has known, or should have known, the many
decisions include the following:

- *AIU Insurance Co. v. Superior Court*, 51 Cal. 3d 807, 842 (1990):
  "contamination of the environment satisfies" the requirement of
  property damage.

- *Aetna Casualty & Surety Co. v. Pintlar Corp.,* 948 F.2d 1507, 1514
  (9th Cir. 1991):  "The insurers further concede that contamination of
  the soil and water by hazardous substances constitutes injury to
  property . . . ."  and "[a]n ordinary person would find that the
  environmental contamination alleged . . . falls within the plain
  meaning of 'property damage' as that term is used in policies."

- *Arbeiter v. Cambridge Mutual Fire Insurance Co.*, 1996 WL
  1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996):  presence of oil
  fumes in building constituted "physical loss" to building.

- *Essex Insurance Co. v. BloomSouth Flooring Corp.*, 562 F.2d 399,
  406 (1st Cir. 2009):  odor from carpet and adhesive "can constitute
  physical injury to property."

- *Farmers Insurance Co. of Oregon v. Trutanich,* 123 Or. App. 6, 9-11,
  858 P.2d 1332 (1993):  "[T]he odor produced by the
  methamphetamine lab had infiltrated the house. The cost of removing
  the odor is a direct physical loss."

- *Gregory Packaging, Inc. v. Travelers Property Casualty Co. of
  America,* 2014 WL 6675934, at *5 (D.N.J. Nov. 25, 2014):  closure of
  facility because of accidentally released ammonia; while "structural

PASICH

10

alteration provides the most obvious sign of physical damage, . . . property can sustain physical loss or damage without experiencing structural alteration."

- *Matzner v. Seaco Insurance Co.*, 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998):  building with unsafe levels of carbon monoxide sustained direct physical loss.

- *Mellin v. Northern Security Insurance Co., Inc.*, 167 N.H. 544, 550-51 (2015): cat urine odor inside condominium constitutes direct physical loss; "physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage" to the insured property.

- *Oregon Shakespeare Festival Ass'n v. Great American Insurance Co.*, 2016 WL 3267247, at *9 (D. Ore. June 7, 2016):  "the smoke that infiltrated the theater caused direct property loss or damage by causing the property to be uninhabitable and unusable for its intended purpose."

- *Port Authority of New York & New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226, 236 (3d Cir. 2002):  property sustained a direct physical loss because it was rendered uninhabitable by the presence of asbestos fibers.

- *Sentinel Management Co. v. Aetna Casualty & Surety Co.*, 1999 WL 540466, at *7 (Minn. Ct. App. July 27, 1999):  "If rental property is contaminated by asbestos fibers and presents a health hazard to the tenants, its function is seriously impaired."

- *Sentinel Management Co. v. New Hampshire Insurance Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997):  "Although asbestos contamination does not result in tangible injury to the physical

11

**FIRST AMENDED COMPLAINT**

structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants. . . .  Under these circumstances, we must conclude that contamination by asbestos may constitute a direct, physical loss to property under an all-risk insurance policy."

- *Western Fire Insurance Co. v. First Presbyterian Church,* 165 Colo. 34, 39-40 (1968):  direct physical loss when gasoline contaminated church building making it dangerous to use.

23.    Because Zurich long has been licensed to sell insurance to California insureds, it has known, or should have known, that a California Court of Appeal addressed in 1962—59 years ago—the question of whether a property insurance policy could cover loss or damage to a structure that had no physical damage or alteration.  In *Hughes v. Potomac Insurance Co. of D.C.,* 199 Cal. App. 2d 239 (1962), the insureds' house had been left partially overhanging a cliff after landslide.  The house suffered no physical damage.  However, the court rejected the insurer's argument that there was no "direct physical loss."  The court explained why, and what an insurer should do if it did not want to cover such losses:

Despite the fact that a "dwelling building" might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected.  Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.   [The insureds] correctly point out that a "dwelling" or "dwelling building" connotes a place fit for occupancy, a safe place in which to dwell or live.  It goes without

12

question that [the insureds'] "dwelling building" suffered
real and severe damage when the soil beneath it slid away
and left it overhanging a 30-foot cliff.  Until such damage
was repaired and the land beneath the building stabilized,
the structure could scarcely be considered a "dwelling
building"' in the sense that rational persons would be
content to reside there.[15]

24.    Thus, Zurich has known, or should have known, for decades that its
policies would be called upon to pay perhaps hundreds of millions of dollars or
more to its insureds and, specifically knows that it could be obligated under its
policies to pay tens of millions of dollars to AECOM for losses associated with
viruses and pandemics.

25.    Given the potential liability that insurers, including Zurich, faced
under their policies for losses from pandemics, shortly after the outbreak of SARS
in 2003, the insurance industry undertook to draft exclusions applicable to losses
from viruses and bacteria.  In 2006, the Insurance Services Office, the insurance
industry's drafting organization, considered the need to draft an exclusion that
would bar coverage for losses caused by a virus.[16]

26.    On July 6, 2006, ISO prepared a circular that included a standard
exclusion of loss due to viruses and bacteria as part of its filing with state
insurance regulators.[17]  In that circular, it noted that examples of "viral and

---

[15] *Id.* at 248-49.

[16] "ISO is a nonprofit trade association that provides rating, statistical, and
actuarial policy forms and related drafting services to approximately 3,000
nationwide property or casualty insurers. Policy forms developed by ISO are
approved by its constituent insurance carriers and then submitted to state agencies
for review. Most carriers use the basic ISO forms, at least as the starting point for
their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10
Cal. 4th 645, 671 n.13 (1995).

[17] *See* ISO Circular, *New Endorsements Filed to Address Exclusion of Loss Due to
Virus or Bacteria,* (July 6, 2006),

bacterial contaminants are rotavirus, SARS, [and] influenza," observing, "[t]he universe of disease-causing organisms is always in evolution."[18]  ISO recognized that viruses could cause property damage, stating:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.  When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.[19]

27.    ISO introduced a standard-form exclusion that it entitled "**Exclusion Of Loss Due To Virus Or Bacteri**a" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).

28.    Thus, Zurich has had an "**Exclusion Of Loss Due To Virus Or Bacteria**" since 2006 that is approved for use throughout the United States.  As one recent article succinctly stated, "Insurers knew the damage a viral pandemic could wreak on businesses.  So they excluded coverage."[20]

29.    Even though Zurich knew it could be liable for losses from viruses and pandemics,  it did not include in its Policies the "**Exclusion Of Loss Due To**

---

https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[18] *Id.*

[19] *Id.*

[20] Todd Frankel, *Insurers knew the damage a viral pandemic could wreak on businesses.  So they excluded coverage*, Washington Post (April 2, 2020). In the early wave of coverage litigation over losses associated with the pandemic, many insureds and insurers are fighting over whether the standard-form exclusion actually bars coverage, in whole or in part, for those losses.  Only time will tell.

**FIRST AMENDED COMPLAINT**

**Virus Or Bacteria**."  Furthermore, in selling the Policies to AECOM, Zurich agreed to delete an exclusion that it otherwise would argue applied to limit coverage available for losses involving a virus.  Specifically, while the policy form that Zurich included in the Policies contained an ambiguous Zurich form exclusion that included a "virus [or] disease causing or illness causing agent" as an excluded "contaminant," Zurich included an endorsement expressly deleting the exclusion's reference to a "virus [or] disease causing or illness causing agent."  By doing so, Zurich affirmatively represented that virus-associated losses were insured and confirmed its intent to cover losses caused by a virus or other disease-causing agent.  Therefore, Zurich cannot be surprised that AECOM asked it to pay for AECOM's losses.

## THE ZURICH EDGE GLOBAL POLICIES

30.  Zurich introduced its EDGE policies in 2008.  When it did so, it stated:

> "We listened to our customers and developed a policy that meets their needs," said Mario Vitale, CEO of Zurich's Global Corporate in North America (GCiNA) business unit. "This new policy gives them higher limits, broader coverage and greater flexibility. The Zurich Edge dramatically enhances our ability to serve customers in this important line of business and offers significant advantages for global property programs and global property fronting arrangements.
>
> "In addition to being globally compliant, the policy also has the advantage of being offered by Zurich, which is often recognized for offering one of the broadest and most diverse portfolios of products and services in the world," Vitale said. "The Zurich Edge policy is clearly written

15

> with all limits, sub-limits and other critical coverage issues incorporated within the policy declarations and is supported by Zurich's global network of risk engineering and claims professionals."[21]

31.　Zurich sold AECOM Zurich EDGE Global Policy number PPR6299216-00 for the period of April 1, 2019, to April 1, 2020, and Zurich Edge Global Policy number PPR6299216-01 for the period April 1, 2020, to April 1, 2021.  True and correct copies of at least the relevant portions of the Policies are attached hereto as Exhibits A and B and incorporated herein by reference.

32.　Each of the Policies provides $250,000,000 of insurance, with sublimits for various perils. Unless the Policies otherwise state, these limits of liability apply separately to each **Occurrence**.

33.　The Policies insure AECOM's "interest in buildings (or structures)" and "Personal Property."  Policies ¶¶ 3.01.01 & 3.01.02.

34.　The Policies insure "against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property . . . ."  *Id.* ¶ 1.01.  A **Covered Cause of Loss** is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."  *Id.* ¶ 7.11.  However, the phrase "direct physical loss of or damage . . . to Property" is not defined in the Policies.

35.　The Policies have a separate section providing AECOM with "Time Element" insurance.  Its "Loss Insured" provision states in relevant part:

> The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location.

---

[21] http://www.zurichservices.com/zus/zna_config.nsf/pages/9123da88864cd81485257433006ed710!OpenDocument&Click= (last visited Mar. 25, 2021).

**FIRST AMENDED COMPLAINT**

The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**, or as provided in Off Premises Storage for Property Under Construction Coverages.

The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations. Such other Location must depend on the continuation of business activities at the **Location** that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.

*Id.* ¶ 4.01.01.

36.     The Policies define "**Suspension**" as "[t]he slowdown or cessation of the Insured's business activities . . . ." *Id.* ¶ 7.69.01.

37.     The Policies' "Time Element" section also insures "Extra Expense," obligating Zurich to pay for

the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability**,** to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**.

*Id.* ¶ 4.02.03.

**FIRST AMENDED COMPLAINT**

38. The Policies also include "Civil or Military Authority" insurance for losses

> resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within [five miles] of the Insured's Location . . . .

*Id.* ¶ 5.02.03.

39. The Policies also insure "Contingent Time Element" losses that AECOM suffers because of "direct physical loss of or damage to" third-party property. *Id.* ¶ 5.02.05.

40. The Policies also include "Ingress/Egress" coverage for losses that AECOM suffers when

> ingress or egress to [an] Insured Location by [its] suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by [AECOM] or insured under this Policy and located within [5 miles] of the Insured Location . . . .

*Id.* ¶ 5.02.15.

41. The Policies also include coverage for "Protection and Preservation of Property." Specifically, the Policies insure:

> [t]he reasonable and necessary costs incurred for actions

18

**FIRST AMENDED COMPLAINT**

PASICH

to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property; and [t]he Gross Earnings loss or Gross Profit loss sustained by the Insured for a period of time not to exceed [48 hours] prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property.

*Id.* ¶¶ 5.02.23.01 & 5.02.23.02.

42.  The Policies provide a range of other coverages for losses, which also may apply.

43.  None of AECOM's losses are conspicuously, plainly, and clearly excluded by the Policies.

44.  The Policies' standard form includes a Contamination Exclusion. This exclusion states, in part:

This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy. **Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy.

*Id.* ¶¶ 3.03.01 & 3.03.01.01.

45.  The Policies' standard form defines **Contamination (Contaminated)** as Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism,

19

bacteria, ***virus, disease causing or illness causing agent***,

**Fungus**, mold or mildew.

*Id.* ¶ 7.09 (emphasis added).

46.     However, Zurich agreed in selling the Policies to delete "virus [and] disease causing or illness causing agent" from the definition and thus from what the Policies excluded.  Specifically, Zurich agreed to replace the standard-form definition of excluded **Contamination (Contaminated)** by narrowing the scope of the definition of **Contamination (Contaminated)**.  Zurich changed the definition of **Contamination (Contaminated)** to:

Any condition of property due to the actual presence of

any **Contaminant(s)**.

*Id.*, Amendatory Endorsement – Louisiana, EDGE-219-C (01/18) ¶ 11.  Zurich then defined **Contaminants** not to include "virus, disease causing or illness causing agent."  Specifically, Zurich defined **Contaminants** as

Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed),  other hazardous substances, **Fungus** or **Spores**.

*Id.*, Amendatory Endorsement – Louisiana, EDGE-219-C (01/18) ¶ 12.  Therefore, while the **Contamination (Contaminated)** exclusion in the policy form includes a phrase defined to include "virus, disease causing or illness causing agent," Zurich amended the Policies to remove viruses and disease-causing or illness-causing agents from the scope of the exclusion.

47.     Furthermore, while the Amendatory Endorsement referenced "Louisiana" in its title, unlike other amendatory endorsements in the Policies, this endorsement does not purport to limit its changes to risks only in Louisiana. Therefore, the endorsement plainly, clearly, and reasonably interpreted is not

**FIRST AMENDED COMPLAINT**

limited in geographic scope to only risks and losses in Louisiana.  Even if Zurich had not removed "virus, disease causing or illness causing agent" from the scope of the exclusion, the exclusion still would not apply because the efficient proximate (predominant) causes of AECOM's losses cannot be ascribed to "contamination" within the scope of the exclusion and because there are other insured causes of AECOM's loss.  Additionally, the exclusion would not apply to bar coverage because it is a hidden virus exclusion, rather than one that is conspicuous, plain, and clear, and because "contamination" and "contaminant" are not reasonably understood to include a virus or disease.

48.     Zurich modified the Amendatory Endorsement in subsequent versions of its Edge policies—apparently recognizing that, at a minimum, its prior Contamination Endorsement was ambiguous.  Specifically, Zurich replaced Endorsement EDGE-219-C (01/18) with Endorsement EDGE-219-D (10/20) in many of its Edge policies issued after March 2020.  A true and correct copy of Endorsement EDGE-219-D (10/20) is attached hereto as **Exhibit C** and incorporated herein by reference.  In the new endorsement, Zurich included language specifying that the "endorsement only applies to locations in Louisiana." Indeed, in renewing the 2020-21 Policy it sold to AECOM, Zurich used its new Amendatory Endorsement.

49.     None of the Policies' exclusions bar coverage for AECOM's losses because the efficient proximate causes of those losses are covered under the terms of the "all-risk" policy and are not conspicuously, plainly, and clearly excluded.

## THE COVID-19 PANDEMIC AND
## ENSUING CIVIL AUTHORITY ORDERS

50.     In December 2019, SARS-CoV-2 and COVID-19 broke out in Wuhan, China.  Since then, SARS-CoV-2 and COVID-19 have spread throughout the world, prompting the World Health Organization to declare a global pandemic.

51.     As explained by the World Health Organization,

21

COVID-19 is caused by the SARS-CoV-2 virus, which spreads between people, mainly when an infected person is in close contact with another person.

The virus can spread from an infected person's mouth or nose in small liquid particles when they cough, sneeze, speak, sing or breathe heavily. These liquid particles are different sizes, ranging from larger 'respiratory droplets' to smaller 'aerosols'.

Other people can catch COVID-19 when the virus gets into their mouth, nose or eyes, which is more likely to happen when people are in direct or close contact (less than 1 metre apart) with an infected person.

Current evidence suggests that the main way the virus spreads is by respiratory droplets among people who are in close contact with each other.

Aerosol transmission can occur in specific settings, particularly in indoor, crowded and inadequately ventilated spaces, where infected person(s) spend long periods of time with others, such as restaurants, choir practices, fitness classes, nightclubs, offices and/or places of worship. More studies are underway to better understand the conditions in which aerosol transmission is occurring outside of medical facilities where specific medical procedures, called aerosol generating procedures, are conducted.

The virus can also spread after infected people sneeze, cough on, or touch surfaces, or objects, such as tables, doorknobs and handrails. Other people may become

**FIRST AMENDED COMPLAINT**

infected by touching these contaminated surfaces, then touching their eyes, noses or mouths without having cleaned their hands first.[22]

52.    The spread of SARS-CoV-2 is insidious because it can be readily transmitted by asymptomatic individuals—and approximately 40% of all individuals who have COVID-19 are asymptomatic.[23]  Furthermore, pre-symptomatic persons carry the greatest viral-load (i.e., the quantity of virus in an individual's system) among all infected persons, meaning their ability to transmit SARS-CoV-2 is greater than that of symptomatic persons.[24]

53.    Aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in air and infective for 16 hours, until gravity ultimately forces them to the nearest surface.[25]  Studies have reported that SARS-CoV-2 can remain on surfaces for at least 28 days.[26]  These droplets thus physically alter the air and airspace in which they are present and the surfaces to

---

[22] *Q&A: How is COVID-19 transmitted*, World Health Organization (July 9, 2020), https://www.who.int/news-room/q-a-detail/q-a-how-is-covid-19-transmitted.

[23] Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says*,  Business Insider (Jul 12, 2020). https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7.

[24] Xi He, *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 ("We detected high viral loads soon after symptom onset, which then gradually decreased towards the detection limit at about day 21. . . . Our analysis suggests that viral shedding may begin 5 to 6 days before the appearance of the first symptoms. After symptom onset, viral loads decreased monotonically, consistent with two recent studies.")

[25] *See* Leslie Tate, *Virus Survives In Air For Hours,* Tulanian (Fall 2020), https://tulanian.tulane.edu/fall-2020/virus-survives-in-air-for-hours/.

[26] *See, e.g.,* CNBC, *Virus that causes Covid-19 can survive for 28 days on common surfaces, research says* (Oct. 12, 2020), https://www.cnbc.com/2020/10/12/virus-that-causes-covid-19-can-survive-for-28-days-on-surfaces-research-says.html; Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles, & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7.

23

which they attach.  By doing so, they also render property unusable for its intended purpose and function and require further physical alterations, such as installation of physical barriers restricting the movement of the aerosolized droplets.

54.    Since January 1, 2020, and as of the date of the filing of this First Amended Complaint, there have been more than 124,216,000 confirmed cases of COVID-19 throughout the world, more than 2,735,000 of which have resulted in deaths.[27] Moreover, due in part to the initial absence of available tests, it is believed that the true number of coronavirus cases is significantly higher than the reported numbers might suggest.[28]

55.    Since the outbreak of SARS-CoV-2 and COVID-19, and in response thereto, civil authorities throughout the world issued "stay-at-home" and "shelter in place" orders, travel restrictions, road closures, quarantines, and other orders, including orders requiring the suspension of non-essential business operations.

56.    Various of these civil authority orders and actions substantially impaired AECOM's ability to operate its business.  Indeed, in certain jurisdictions, orders required AECOM to suspend operations, mandating the closure of both AECOM's offices and project sites.  In some jurisdictions, state and local civil authority orders and actions substantially impaired the functionality of AECOM's locations, offices, and project sites by, among other things, imposing restrictions on the use of office space, limiting the number of guests allowed to congregate in conference rooms and project sites, and otherwise interfering with AECOM's business activities.  Furthermore, in some jurisdictions, AECOM was deemed an essential business and allowed to stay open, subject to compliance with new rules and regulations regarding social distancing protocols and office alterations to

---

[27] *See* https://covid19.who.int/ (last visited Mar. 25, 2021).

[28] *See* Associated Press, *How many people have had coronavirus with no symptoms?,* NBC News (April 20, 2020), https://www.nbcnews.com/health/health-news/how-many-people-have-had-coronavirus-no-symptoms-n1187681.

**FIRST AMENDED COMPLAINT**

ensure the safety of all employees, clients, vendors, and third parties. Thus, even in the jurisdictions that permitted AECOM to stay open and operational, AECOM incurred substantial costs and extra expense to comply with the governing civil authority orders and actions. The civil authority orders required the "suspension" of AECOM's operations, as that term is defined in the Policies, at AECOM's locations, offices, operations, and projects around the world.

57.     In addition to substantially impairing its normal business operations, civil authority orders also impaired access to AECOM's locations, offices and project sites. Specifically, in many jurisdictions, as a result of SARS-CoV-2, COVID-19, the imminent threat of SARS-CoV-2, and/or the civil authority orders, ingress to and egress from certain of AECOM's locations, offices and project sites was significantly impaired, restricting or prohibiting AECOM's employees, customers, suppliers, vendors, prospective business partners, and other third parties from accessing or visiting AECOM's offices and projects sites.

58.     Moreover, civil authority orders, including orders prohibiting ingress and egress, and other actions across the world impaired nearby businesses and properties that AECOM relies upon for its business operations, including AECOM's customers, suppliers, vendors, and contractors.

## THE SARS-CoV-2 VIRUS HAS CAUSED WIDESPREAD PHYSICAL LOSS AND DAMAGE TO AECOM'S PROPERTIES

59.     The civil authority orders were issued due to the physical presence of the SARS-CoV-2 virus throughout the world, and specifically throughout the communities immediately surrounding AECOM's insured locations, and the desire to avoid the spread of SARS-CoV-2 and the disease that it causes, COVID-19. Specifically, these civil authority actions were taken due to the highly contagious nature of the SARS-CoV-2 virus and the ways in which it physically alters tangible property—including air, airspace, furniture, surfaces, and personal property in and around buildings.

60.     AECOM has locations, offices, operations, and projects around the world.  To date, more than 500 AECOM employees throughout the world have tested positive for COVID-19.  Thus, there is no doubt that SARS-CoV-2 was present, or at least was presumptively present, at many of AECOM's locations, offices, operations, and projects that remained open throughout the world.

61.     Though microscopic, SARS-CoV-2—like all viruses—is a physical substance.  The virus is highly contagious and mobile.  The SARS-CoV-2 virus spreads from person to person primarily through fine aerosolized droplets containing the virus.  These aerosolized droplets are expelled into the air when infected individuals breathe, talk, sing, cough, or sneeze.  Their presence in the air and airspace constitutes a physical alteration to the air and airspace, constituting physical damage.  Once released, these droplets can physically rest and remain on surfaces of objects or materials for at least 28 days.  Human contact with the air, airspace, and surfaces can lead to transmission of the virus, making it very dangerous for individuals to come in contact with property in which SARS-CoV-2 is present.  This is a particular concern for places of employment and places open to the public, which contain numerous common touchpoints and areas, such as door handles and bathrooms, with surfaces that are used by multiple people every day.

62.     Aerosolized droplets expelled by individuals with COVID-19 also can linger suspended in the airspace of buildings for up to 16 hours.  Scientists have likened the ubiquitous aerosolized droplets of the virus to smoke, present in the air long after the source of its dissemination has gone.[29]  Thus, entering a building or other location where the SARS-CoV-2 virus is physically present in the air poses an imminent and severe risk to human health.

---

[29] *See* Kimberly A. Prather, *et al, Airborne Transmission of SARS-CoV-2*, Science (Oct. 16, 2020), available at https://science.sciencemag.org/content/370/6514/303.2.

**FIRST AMENDED COMPLAINT**

63.    The Environmental Protection Agency ("EPA") has compiled several studies reflecting epidemiological evidence suggestive of SARS-CoV-2 transmission through aerosol.[30]  Based on these and other studies, the EPA has recommended that facilities make improvements to their ventilation and HVAC systems by, for example, increasing ventilation with outdoor air and air filtration.[31] The purpose of these measures is to physically remediate the quality of the air by, among other things, diluting the concentration of virus particles or by trapping and removing them.

64.    SARS-CoV-2 spreads by property- or surface-to-person transmission when an uninfected person touches an object or surface that has come into contact with the discharges of an infected person, and the uninfected person then touches their eyes, nose, or mouth.[32]  Once surfaces are physically affected by SARS-CoV-2, they are referred to as fomites.[33]  Fomites consist of both porous and nonporous surfaces or objects that can become infected with a virus and serve as vehicles of transmission.[34]  Scientists have identified indirect transmission via objects such as

---

[30] *See* U.S. Environmental Protection Agency, *Indoor Air and COVID-19 Key References and Publications*, https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-and-publications (last visited Mar. 25, 2021).

[31] *See* U.S. Environmental Protection Agency, *Indoor Air and Coronavirus (COVID-19)*, https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19 (last visited Mar. 25, 2021).

[32] *Zeynep* Tufeckci, *We Need to Talk About Ventilation*, The Atlantic (July 30, 2020), https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/614737/; National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-for-hours-surfaces; Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England Journal of Medicine (2020), https://www.nejm.org/doi/full/10.1056/nejmc2004973.

[33] Stephanie A. Boone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, American Society for Microbiology (Mar. 13, 2007), https://aem.asm.org/content/73/6/1687.

[34] *Id.*

PASICH

1  elevator buttons and restroom faucets in a shopping mall as an important possible

2  cause of a "rapid spread" of the coronavirus.[35]

3      65.    Among other things, the presence of SARS-CoV-2 transforms

4  everyday surfaces and objects into fomites, causing a tangible change of the

5  property into a transmission vehicle for disease from one host to another. The

6  World Health Organization's description of fomite transmission of COVID-19

7  expressly recognizes this physical alteration of property, describing viral droplets

8  as "**creating** fomites (contaminated surfaces)."[36]  "Creating" involves making or

9  bringing into existence something new, such as something that is in an altered state

10  from what it was before SARS-CoV-2 was present on, in, and around the property.

11      66.    Thus, SARS-CoV-2 causes physical damage and physical loss by,

12  among other things, physically permeating, attaching to, binding to, corrupting,

13  destroying, distorting, changing, and altering property, and by rendering property

14  unusable, unfit for its intended function, dangerous, and unsafe.

15      67.    Because SARS-CoV-2 attaches to surfaces, lingers in the air and

16  airspace of buildings, and can move through HVAC systems to spread throughout

17  buildings, the presence of SARS-CoV-2 causes a distinct, demonstrable, physical

18  alteration to property, thus causing "direct physical loss of or damage to property"

19  as that phrase is used in the Policies.[37]  Just like invisible pollution in water ***alters***

20

21  _____

22  [35] Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 Emerging Infectious Diseases 1343, 1345 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article.

23  [36] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions .

24

25

26  [37] *See* Jianyun Lu & Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 Emerging Infectious Diseases 11 (Sep. 11, 2020), https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation ("We conclude that the air conditioner prompted transmission of SARS-CoV-2; the customers in the airflow were at high risk for infection with SARS-CoV-2 in the poorly ventilated environment.")

27

28

the water, the presence of the SARS-CoV-2 virus *alters* the air and airspace in which it is found and the property on which it lands. In this way, the presence of SARS-CoV-2 causes a physical transformation of the air and airspace in which they are present and the surfaces to which they attach. It changes the air and the surfaces into dangerous transmission mechanisms for SARS-CoV-2, rendering the affected property unsafe, unfit and uninhabitable for ordinary functional use.

68.    Moreover, the actual or imminent presence of SARS-CoV-2 on property causes physical loss and physical damage by requiring remedial measures to reduce or eliminate the presence of SARS-CoV-2, including extensive cleaning and disinfecting; installing, modifying, or replacing air filtration systems; remodeling and reconfiguring physical spaces; and other measures.

69.    In addition, the presence of SARS-CoV-2 on or near a property creates a substantial risk and/or an imminent threat of further damage to that property or to nearby property. Individuals who come into contact with, for example, respiratory droplets on a doorknob or handrail at one location, may carry those droplets on their hands and deposit them elsewhere, causing additional damage and loss.

70.    Even frequent and routine cleanings cannot be assumed to have eliminated SARS-CoV-2 from a premises, given its ability to spread easily and quickly as long as people are entering the premises during an outbreak at or near the premises. A number of studies have demonstrated that SARS-CoV-2 is "much more resilient to cleaning than other respiratory viruses so tested."[38] The measures that must be taken to remove SARS-CoV-2 from property are significant and far beyond ordinary or routine cleaning. *Id.* The epidemiological trajectory of the outbreaks in the United States and other countries shows that even expensive

---

[38] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), https://doi.org/10.1002/jmv.26170.

1  new cleaning measures cannot completely eliminate viral presence once SARS-
2  CoV-2 binds to and adheres to property.

3      71.    Moreover, the fact that SARS-CoV-2 can be cleaned from surfaces
4  when detected is irrelevant. This does not reduce the danger. The presence of other
5  substances that can be cleaned from surfaces, such as mold, asbestos, mud, smoke,
6  and oil spills are widely recognized as constituting damage to property and have
7  been found to  constitute "property damage" under property insurance policies.

8      72.    Given the size of its operations, AECOM is especially susceptible to
9  sustaining extensive direct physical loss or damage because of SARS-CoV-2.  In
10 conducting normal business, hundreds of people, including employees, customers,
11 consultants, vendors and third parties, typically enter and use shared spaces, such
12 as lobbies, conference rooms, restrooms, and hallways, in just a few hours.
13 Moreover, surfaces such as counters, bannisters, doorknobs, faucets, soap and
14 towel dispensers, vending machines, ice machines, elevator buttons, and lobby
15 furniture all present ways to spread SARS-CoV-2 and increase COVID-19
16 infections.

17     73.    Because COVID-19 is a global pandemic and SARS-CoV-2 is
18 statistically certain to be carried by a number of individuals who visit AECOM's
19 locations, SARS-CoV-2 is continually reintroduced to the air, airspace, and
20 surfaces of AECOM's properties and the property of third parties.

21     74.    Moreover, it is widely recognized that "confirmed" cases of COVID-
22 19 do not tell the full story.  Many individuals infected with COVID-19 are
23 asymptomatic and/or do not get tested for the disease.  Furthermore, the lack of
24 extensive available testing, especially at the beginning of the pandemic, has
25 resulted in a further under-reporting of COVID-19 cases.

26     75.    On February 28, 2020, in a national news article circulated by CNN,
27 UC Davis Medical Center's infection disease specialist, Dr. Dean Blumberg,
28 warned that "the virus is out there in the community, and that means pretty much

30

**FIRST AMENDED COMPLAINT**

1  that everybody's at risk. We don't know who might be carrying it. We don't know

2  who we can get it from."[39]

3      76.    Indeed, by March 2020, based on the spread patterns of SAR-CoV-2

4  and insidious nature of the disease, many state and local officials in the United

5  States instructed residents to assume that SARS-CoV-2 was everywhere and

6  cautioned residents only to leave their homes for essential or life-sustaining

7  purposes.  Similar orders and guidelines have remained in effect largely since

8  across the world.

9      77.    Accordingly, since no later than March 2020, the SARS-CoV-2 virus

10  has been ubiquitous throughout the world, causing physical loss, damage, and

11  destruction to airspace and other property, including property at AECOM's

12  locations, offices, operations, projects and nearby businesses and properties upon

13  which AECOM relies.

14      78.    Government officials have repeatedly echoed these warnings.  For

15  example, Los Angeles County Public Health Director Barbara Ferrer stated,

16  "Everyone should keep in mind that community transmission rates are so high that

17  you run the risk of an exposure whenever you leave your home . . . Assume that

18  this deadly invisible virus is everywhere, looking for a willing host."[40]  Similarly,

19  in July 2020, Los Angeles Mayor Eric Garcetti stated in a Coronavirus briefing

20  that "[w]e need to assume that COVID-19 is everywhere right now."[41]

21

---

22  [39]  *See* Elizabeth Cohen, *Its likely there are more coronavirus cases in the United States than the numbers show,*  CNN (March 2, 2020),

23  https://www.cnn.com/2020/02/28/health/coronavirus-uncounted-cases-community-spread/index.html.

24  [40] *See* Rong-gong Lin II et al, *New, extreme precautions urged for L.A. County residents because COVID is 'everywhere,'* LA Time (Jan. 5, 2021),

25  https://www.latimes.com/california/story/2021-01-05/la-county-residents-warned-covid-19-everywhere.

26

27  [41] *See* Tom Tapp, *Los Angeles Coronavirus Update: Mayor Eric Garcetti Says, "We Need to Assume COVID-19 Is Everywhere Right Now,"* Deadline (July 22,

28  2020), https://deadline.com/2020/07/los-angeles-coronavirus-mayor-eric-garcetti-

**FIRST AMENDED COMPLAINT**

PASICH⸱

79.    For indoor spaces—such as AECOM's offices around the globe—the risks of exposure are even greater.  For this reason, such locations were mandated to close whenever possible: "Closures should include high-risk indoor settings where people congregate, like bars, restaurants, entertainment venues, gyms, and indoor religious spaces, and possibly indoor offices where transmission risk cannot be lowered through mitigation efforts."[42]

80.    Indeed, AECOM is informed and believes, and on that basis alleges, that while AECOM has taken, and continues to take appropriate health and safety measures, SARS-CoV-2 has been present at all or most of its locations, offices, and project sites.  AECOM is aware of reported cases of COVID-19 at several of its locations.  Given the widespread nature of SARS-CoV-2 and COVID-19, it is likely that SARS-CoV-2 has been present at all of AECOM's locations at one point or another.  AECOM has taken reasonable and necessary steps and incurred considerable expense to eliminate SARS-CoV-2 from its locations, prevent SARS-CoV-2 from entering its locations, and otherwise mitigate its losses, all as is expressly required by the Policies.

81.    Furthermore, AECOM is informed and believes, and on that basis alleges, that SARS-CoV-2 has been present at numerous nearby properties in the vicinity of AECOM's locations that AECOM relies upon for its business.

82.    As SARS-CoV-2 and COVID-19 spread around the world, AECOM suffered loss and damage covered by the Policies.  Indeed, SARS-CoV-2 and the resulting government closure orders physically altered and impaired the functioning of the tangible, material dimensions of AECOM's property.  This is especially true when, as here, property has been rendered partially or wholly

---

we-need-to-assume-covid-19-is-everywhere-right-now-1202992490/.

[42]  https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200729-resetting-our-response.pdf (last visited Mar. 25, 2021).

**FIRST AMENDED COMPLAINT**

nonfunctional for its intended purpose as a result of the presence of SARS-CoV-2, the pandemic, and the government closure orders, and when AECOM has had to take, and will need to continue to take, steps that involve physical alterations to its insured locations, including installation of transmission-restricting barriers and devices and redesigns to accomplish physical spacing and distancing.

83.    AECOM has sustained covered losses as defined in the Policies, including Time Element and Extra Expense losses.  These Time Element and Extra Expense losses were sustained because of the "necessary **Suspension**" of AECOM's business operations as a result of "direct physical loss of or damage to" insured premises, and "Direct Dependent Time Element Locations."  These Time Element losses were also caused by the civil authority orders, which constitute "order(s) of civil or military authority that prohibit[] access," as that phrase is used in the Policies.

84.    Many of AECOM's financial losses are insured under one or more "Special Coverages" in the Policies issued to AECOM.  These losses were caused by the presence of SARS-CoV-2 on, in, or around property, the imminent threat of the virus on, in, or around property, the civil authority orders, or all three.

85.    The civil authority orders were issued in response to the presence of SARS-CoV-2 and to curb the spread of the virus and the disease that it causes, COVID-19.  Indeed, given how SARS-CoV-2 lingers in the air and on surfaces and its manner of transmission, and the desire to "flatten the curve," AECOM's locations, offices, and projects could not perform all their essential functions. Even AECOM's locations that were allowed to remain open were substantially impaired and were forced to suspend operations.  In this regard, the imminent threat of SARS-CoV-2 and the resulting civil authority orders substantially impaired the functionality of AECOM's locations, offices and project sites, and other property by, among other things, preventing and/or impairing the ability of AECOM from fully utilizing its property for its intended purpose.  In substantially

33

1   impairing the functionality of AECOM's insured properties, the civil authority

2   orders caused "direct physical loss of or damage" to property as that phrase is used

3   in the Policies.

4       86.    Similarly, many nearby Direct Dependent Time Element Locations

5   suffered "direct physical loss of or damage" to property as a result of the presence

6   of SARS-CoV-2 at their properties, the imminent threat of the virus at their

7   properties, the civil authority orders, or all three.  AECOM is informed and

8   believes and on that basis alleges that SARS-CoV-2 was present on and in the

9   vicinity of certain Direct Dependent Time Element Locations, rendering the

10  properties unsafe and unusable, and causing direct physical loss or damage to

11  property.  Furthermore, given the nature of SARS-CoV-2 and how it causes loss

12  and damage to property, these Direct Dependent Time Element Locations could

13  not fulfil their essential function.  As a result of the "direct physical loss of or

14  damage" to nearby Direct Dependent Time Element Locations, AECOM sustained

15  substantial financial losses covered under the Policies.

16  **<u>ZURICH'S BREACHES AND WRONGFUL CONDUCT</u>**

17      87.    AECOM timely notified Zurich and, over the course of several

18  months, provided Zurich with information about its losses.

19      88.    Although AECOM has sustained substantial losses falling squarely

20  within the coverage afforded under the Policies, Zurich has failed and refused to

21  acknowledge coverage for AECOM's losses.  Zurich has also refused to

22  acknowledge coverage for Extra Expenses and other costs covered under the

23  Policies, including costs reasonably and necessarily incurred by AECOM to

24  mitigate and prevent its losses.

25      89.    Specifically, on May 6, 2020, AECOM representatives spoke with

26  John Harmon, Zurich's Supervisor International Property Claims and its

27  designated representative, providing additional information about AECOM's

28  losses.

90.    On May 7, 2020, Mr. Harmon sent an e-mail to AECOM, providing a "a recap of the information shared" by AECOM, summarizing it in part as follows:

- AECOM provides multinational design and consulting engineering services to major clients globally.

- AECOM has a total of 800 offices with 350 in North America and 450 outside of North America

- Insured is claiming revenue loss throughout the global network including Asia, Europe and the Middle East. Additionally, several hundred projects were shut down.

- Some offices were closed (China and Hong Kong).  In some offices, services were deemed essential and did not close.  Whether offices were closed depends on the circumstances of each office.  Some offices are working remotely.

- More than 100 employees tested positive at various offices globally for COVID-19.

- Insured counsel representative stated that there was no physical damage in regards to structural damage to any of the buildings. However, counsel stated that physical damage was quite evident with presence of the virus.

- Insured is gathering the information and will submit a detailed claim submission including a spreadsheet of all locations impacted in the upcoming weeks/months.

91.    On May 11, 2020, AECOM responded, correcting certain aspects of Mr. Harmon's "recap" as follows:

- AECOM provides multinational design and consulting engineering services to major clients globally.  AECOM also provides real estate development, construction and construction management services.  Please reference aecom.com for a full range of services.

35

- AECOM has ~~a total of~~ under 800 offices with ~~350~~ 343 in the US, Puerto Rico and USVI ~~North America~~ and ~~450~~ 436 non-US locations ~~outside of North America~~

- Insured is claiming revenue loss ~~throughout the~~ from its global network throughout the Americas, EMEA and APAC regions. ~~Asia, Europe and the Middle East.~~ Additionally, ~~several~~ over 650 projects ~~have been were shut down~~ were closed as of last week. This does not include prior closures that have been reopened.

- Some offices were closed (China and Hong Kong are two examples, but the full scope of closures is being compiled). In some offices, services were deemed essential and did not close. Whether offices were closed depends on the circumstances of each office. Some offices are working remotely.

- As of last week, more than 100 employees tested positive at various offices globally for COVID-19.

- Insured counsel representative stated that there was no physical damage in the sense of structural damage to any of the buildings. However, counsel stated that physical loss or damage was quite evident with presence of the virus.

- Insured is gathering the information and will submit a detailed claim submission including a spreadsheet of all locations impacted in the upcoming weeks/months. AECOM will be submitting claims for locations as they become available.

92.   AECOM and Zurich continued to communicate thereafter about AECOM's claim.

93.   On August 18, 2020, AECOM's representatives engaged in a WebEx meeting with Mr. Harmon and Zurich's coverage counsel. During that meeting, AECOM presented Zurich with "**AECOM – Mainland China Offices** Interim

Time Element Insurance Claim Resulting from Lockdowns in China Caused by COVID."  AECOM also shared with Zurich a written copy of its presentation.

94.    On August 23, 2020, Mr. Harmon acknowledged receipt of the presentation and posed a few questions for clarification.  He also stated:

> Zurich maintains its position that the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage and will advise in the official coverage determination communication.

95.    By September AECOM still had not received Zurich's promised "official coverage determination communication."  Therefore, AECOM sent an e-mail to Mr. Harmon stating, in relevant part:

> We wanted to circle back to your previous questions:
>
> 1) Please note that there are other countries and regions where AECOM's businesses have been affected by COVID besides China.  At this time, we are still collecting and reviewing the impact.  We will be submitting these losses in addition to the China/HK claim.
>
> 2) Regarding the infection rate, this is based on internal reporting, not the CDC's 10% infection modeling rate.
>
> 3) Finally, physical alterations were and continue to be undertaken and AECOM intends to submit the losses associated with such as part of its claim.
>
> Please advise the timing of Zurich's official coverage determination, and whether you have any other questions.  Thank you.

96.    On October 13, 2020, Zurich finally provided AECOM with its coverage position.  Mr. Harmon stated that Zurich has "completed review of this

37

1  file and conclude that occurrence is not covered under the global program, both

2  local and master policies.  We are therefore proceeding to deny coverage at this

3  time."   Specifically, Mr. Harmon stated:

4      [T]he Policy does not provide coverage for AECOM's

5      claim. In short, AECOM's claim . . .  does not establish a

6      physical loss or damage of the type insured by the

7      Policy. The Policy, under the Property Damage coverage

8      part, insures risks of direct physical loss or damage

9      which is not excluded by the Policy. AECOM's claim,

10     which is based on slow-downs or closures due to actual

11     or suspected spread of the SARS-CoV-2 virus, which

12     causes the disease COVID-19, or governmental orders

13     issued to prevent the spread of COVID-19, is not due to

14     direct physical loss or damage.

15 97.  Mr. Harmon further stated:

16     In addition, if or to the extent AECOM claims that the

17     presence of the SARS-CoV-2 virus on or in tangible

18     property constitutes contamination of that property,

19     AECOM's claim would in any event be excluded by the

20     Contamination exclusion in the Policy, which

21     specifically excludes any condition of property due to the

22     actual presence of any virus, or other disease causing or

23     illness causing agent.

24 98.  AECOM is entitled to the maximum amounts of coverage needed to

25 indemnify it for its losses for the maximum periods of time provided by and under

26 the Policies.

27 99.  To the extent not waived or otherwise excused, AECOM has

28 complied with the provisions contained in the Policies.  Therefore, AECOM is

38

**FIRST AMENDED COMPLAINT**

PASICH

entitled, on behalf of itself and all other insureds, to all benefits of insurance provided by the Policies.

100.   As a direct result of Zurich's breaches, AECOM has suffered and will continue to suffer millions of dollars in damages.  Zurich is liable for these damages.

## FIRST CAUSE OF ACTION

### (Breach of Contract—2019-20 Policy)

101.   AECOM realleges and incorporates by reference paragraphs 1 through 100 above.

102.   By acting as alleged above, by denying coverage, and by failing to agree to pay, let alone pay AECOM for the insured losses, Zurich breached its duties under the 2019-20 Policy.

103.   As a direct and proximate result of Zurich's breaches, AECOM has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.  AECOM will seek leave to amend this Complaint once it ascertains the full extent of its damages.

## SECOND CAUSE OF ACTION

### (Anticipatory Breach of Contract—2019-20 Policy)

104.   AECOM realleges and incorporates by reference paragraphs 1 through 100 above.

105.   By acting as alleged above, by stating that "Zurich maintains its position that the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage," and by failing to agree that it will pay for any part of AECOM's losses, Zurich has clearly stated that it will not meet or perform its obligations under the 2019-20 Policy and will not pay for AECOM's losses. Zurich has done so even though AECOM has fully cooperated with Zurich in its investigation, fully answered the questions posed by Zurich, and AECOM has indicated that it is willing to perform any obligations that it might have under the

2019-20 Policy to the extent not waived or excused.  AECOM is, in fact, prepared and ready to perform any such obligations.

106.   Therefore, to the extent that any aspect of Zurich's acts and omissions is not deemed to constitute a breach of the 2019-20 Policy, they constitute an anticipatory breach of the 2019-20 Policy.

107.   As a direct and proximate result of Zurich's acts and omissions, AECOM has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.  AECOM will seek leave to amend this Complaint once it ascertains the full extent of its damages.

## THIRD CAUSE OF ACTION

### (Anticipatory Breach of Contract—2020-21 Policy)

108.   AECOM realleges and incorporates by reference paragraphs 1 through 100 above.

109.   By acting as alleged above, by stating that "Zurich maintains its position that the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage," and by failing to agree that it will pay for any part of AECOM's losses under the 2019-20 Policy, Zurich has clearly stated that it will not meet or perform its obligations under the Policies and will not pay for AECOM's losses.  Zurich has done so even though AECOM has fully cooperated with Zurich in its investigation, fully answered the questions posed by Zurich, and AECOM has indicated that it is willing to perform any obligations that it might have under the Policies to the extent not waived or excused.  AECOM is, in fact, prepared and ready to perform any such obligations.

110.   AECOM is informed and believes that given Zurich's denial of coverage under the 2019-20 Policy, Zurich will deny coverage for AECOM's claim under the 2020-21 Policy and refuse to meet and perform its obligations under the 2020-21 Policy as well.

**FIRST AMENDED COMPLAINT**

111.   Therefore, Zurich's acts and omissions constitute an anticipatory breach of the 2020-21 Policy.

112.   As a direct and proximate result of Zurich's acts and omissions, AECOM has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.  AECOM will seek leave to amend this Complaint once it ascertains the full extent of its damages.

## FOURTH CAUSE OF ACTION

### (Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)

113.   AECOM realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 100, 102, 105, 109, 110, and 111 above.

114.   Implied in the Policies is a covenant that Zurich would act in good faith and deal fairly with AECOM, that Zurich would do nothing to interfere with the rights of AECOM to receive the benefits due under the Policies, and that Zurich would give at least the same level of consideration to AECOM's interests as it gives its own interests.

115.   Zurich also had a duty under the Policies, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under its Policies.

116.   Instead of complying with these duties, Zurich acted in bad faith by, among other things,

a.   Adopting the position that  "the presence of COVID-19 on or in a building or on surfaces does not constitute physical loss or damage" in spite of its prior knowledge of the risks of losses associated with pandemics, its knowledge of court decisions recognizing that the presence of a hazardous substance in a building or its airspace could constitute "direct loss of or damage to property," its failure to include the standard ISO "virus or bacteria exclusion," its deletion of "virus" from its definition of **Contaminants(Contaminated)**, and its failure to

41

consider, let alone meaningfully investigate, the possibility that perils other than a conspicuously, plainly, and excluded peril may be the efficient proximate cause of AECOM's losses;

           b.        Unreasonably failing and refusing to honor its promises and representations;

           c.        Putting its interests above that of its insured; and

           d.        Otherwise acting as alleged above.

117.   In breach of the implied covenant of good faith and fair dealing, Zurich committed the acts alleged above for the purpose of knowingly withholding from AECOM the rights and benefits to which it is and was entitled under the Policies.

118.   Zurich's acts are inconsistent with the reasonable expectations of AECOM, are contrary to established industry custom and practice, are contrary to the express and implied terms of the Policies and constitute bad faith.

119.   As a direct and proximate result of Zurich's breach of the implied covenant of good faith and fair dealing, AECOM has sustained, and continues to sustain, damages in an amount in excess of this Court's jurisdictional limit to be proven at trial.  Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), AECOM is entitled to recover all attorneys' fees that it has reasonably incurred, and continues to incur, in its efforts to obtain the benefits due under the Policies that Zurich wrongfully has withheld, and is withholding, in bad faith.  AECOM is entitled to interest thereon at the maximum legal rate.  AECOM continues to suffer damages because of Zurich's bad faith and will seek to amend this Complaint once it ascertains the full extent of its damages.

120.   AECOM is informed and believes, and on that basis alleges, that Zurich, acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over

1   significant aspects of Zurich's business, performed, authorized, and/or ratified the

2   bad faith conduct alleged above.

3     121. Zurich's conduct is contemptible and has been done with a conscious

4   disregard of AECOM's rights, constituting oppression, fraud, and/or malice.

5   Zurich has engaged in a series of acts designed to deny AECOM of the benefits

6   due under the Policies.  Specifically, Zurich, by acting as alleged above,

7   consciously disregarded AECOM's rights and forced AECOM to incur substantial

8   financial losses, thereby inflicting substantial financial damage on AECOM.

9   Zurich ignored AECOM's interests and concerns with the requisite intent to injure

10  within the meaning of California Civil Code section 3294.  Therefore, AECOM is

11  entitled to recover punitive damages from Zurich in an amount sufficient to punish

12  and make an example of Zurich and to deter similar conduct in the future.

13  **FIFTH CAUSE OF ACTION**

14  **(Declaratory Relief)**

15    122. AECOM realleges and incorporates by reference herein each

16  allegation contains in paragraphs 1 through 100 above.

17    123. AECOM contends that it is entitled to coverage for its losses under

18  the Policies and that its contentions stated above are correct.

19    124. AECOM is informed and believes, and on that basis alleges, that

20  Zurich disputes AECOM's contentions and contends that AECOM is not entitled

21  to coverage under the Policies for any of its losses.

22    125. Therefore, an actual and justiciable controversy exists between

23  AECOM and Zurich concerning the matters alleged herein.

24    126. AECOM seeks a judicial declaration by this Court in accord with its

25  contentions and rejecting Zurich's contentions and stating that AECOM's losses

26  are insured under the Policies.

27

28

**FIRST AMENDED COMPLAINT**

1    127.    A declaration is necessary at this time in order that the parties'

2 dispute may be resolved and that they may be aware of their prospective rights and

3 duties.

4                        **<u>PRAYER FOR RELIEF</u>**

5        WHEREFORE, AECOM prays for relief as follows:

6                        **ON THE FIRST CAUSE OF ACTION**

7    1.        For damages, plus interest, according to proof at the time of trial;

8                        **ON THE SECOND CAUSE OF ACTION**

9    2.        For damages, plus interest, according to proof at the time of trial;

10                        **ON THE THIRD CAUSE OF ACTION**

11    3.        For damages, plus interest, according to proof at the time of trial;

12                        **ON THE FOURTH CAUSE OF ACTION**

13    4.        For damages, including reasonable attorneys' fees plus interest,

14 according to proof at the time of trial;

15    5.        For punitive damages in an amount to be determined at the time of

16 trial;

17                        **ON THE FIFTH CAUSE OF ACTION**

18    6.        For a declaration in accord with AECOM's contentions;

19                        **ON ALL CAUSES OF ACTION**

20    7.        For costs of suit incurred herein; and

21    8.        For such other, further, and/or different relief as may be just and

22 proper.

23 DATED:  March 26, 2021                PASICH LLP

24
                                By:  _____*/s/ Sandra Smith Thayer*_____
25                                        Sandra Smith Thayer

26                                        Attorneys for Plaintiff

27

28

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff AECOM hereby demands a trial by jury in this action.

3

DATED:  March 26, 2021                    PASICH LLP

4

5

By: _____*/s/ Sandra Smith Thayer*_____
            Sandra Smith Thayer

6

Attorneys for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT**